0143

Wayne D. GASQUE, Respondent, v. HEUBLEIN, INC., Heublein Allied Vintners, Inc., United Vintners, Inc., Ben Arnold Company, Inc. d/b/a Fine Wines & Spirits by Ben Arnold Company, Better Brands, Inc., Colonial Stores, Inc., d/b/a Big Star, Defendants, of whom Heublein, Inc., Heublein Allied Vintners, Inc., and United Vintners, Inc. are Appellants. Appeal of HEUBLEIN, INC.

(315 S. E. (2d) 556)

Court of Appeals

*D. W. Green, Jr.,* of *Burroughs, Green & Sasser,* Conway, and *Stephen G. Morrison,* of *Nelson, Mullins, Grier & Scarborough,* Columbia, *for appellants.*

*Kaye Gorenflo Hearn,* of *Stevens, Stevens, Thomas, Hearn & Hearn,* Loris, *for respondent.*

April 9, 1984.

GARDNER, Judge:

This appeal is from a $750,000 jury verdict rendered in favor of the respondent, Wayne D. Gasque, in a products liability action. We affirm.

Respondent Gasque sustained permanent loss of vision in his left eye when he was struck by the stopper and cork assembly of a bottle of Jacques Bonet Cold Duck sparkling wine. The stopper allegedly ejected prematurely when Gasque's friend was twisting the wire retaining hood.

Respondent brought suit against appellants, Heublein, Inc., Heublein Allied Vintners, Inc., and United Vintners, Inc., (HEUBLEIN), manufacturers-bottlers of Jacques Bonet Cold Duck, and three other defendants in the chain of distribution. Gasque sought actual and punitive damages based on negligence, warranty, and strick liability in tort.

The case was submitted to the jury on the theories of negligence and strict liability. No motion to elect or for a special verdict was interposed by appellants. The jury returned a general verdict for actual damages against HEUBLEIN.

Appellants present three questions for review:

1. Whether the trial court erred in submitting to the jury the issues of negligent (a) design, (b) manufacture, (c) inspection, and (d) failure to warn;
2. Whether the trial court erred in admitting into evidence a filmed experiment conducted by respondent's expert; and
3. Whether the trial court erred in failing to grant appellants' motion for a new trial absolute on the ground the verdict was actuated by passion, prejudice and caprice?

The questions presented overlook the "two issue rule" which is firmly established in South Carolina. Where a case is submitted to the jury on two or more theories and a general verdict is returned, the verdict will be upheld if it is supported by at least one theory. *Hussman Refrigerator & Supply Company v. Cash & Carry Groceries, Inc.*, 134 S. C. 191,

132 S. E. 173 (1926); *Anderson v. West,* 270 S. C. 184, 241 S. E. (2d) 551 (1978).

Inexplicably, HEUBLEIN did not brief any of its exceptions relating to the submission of the theory of strict liability to the jury. Exceptions not argued by an appellant in its brief are deemed abandoned. *Nienow v. Nienow,* 268 S. C. 161, 232 S. E. (2d) 504 (1977); Supreme Court Rule 8, § 2. HEUBLEIN has thus abandoned its exceptions relating to the submission of strict liability and is bound by the "two issue rule."

By supplemental brief, HEUBLEIN agrues this Court should depart from the "two issue rule" in products liability cases because negligence and strick liability are so closely intertwined. No petition to argue against precedent was submitted by appellants, as required by our rules. *See* Supreme Court Rule 8, § 10. Nevertheless, we have considered this argument and reject it because of the obvious differences between the two theories, i.e., the different quantum of proof required and the fact that one's origins are statutory while the others are at common law. Additionally, we question this courts authority to carve an exception to a ruling of the Supreme Court. *Shea v. State Dept. of Mental Retardation.* 310 S. E. (2d) 819 (S. C. App. 1983).

Although it is not necessary for this Court to address appellants' arguments with respect to liability in view of the "two issue rule," we hold that ample evidence existed to warrant submission of the theories of negligent design, manufacture, inspection and failure to warn to the jury.

### 1.-A

#### *Negligent Design*

The principal evidence offered by Gasque on the issue of negligent design was two reports *commissioned by appellant, United Vintners, Inc.,* entitled the "Premature Ejection of Champagne Stoppers." These two reports contained the results of tests conducted by an independent agency, Dave Eolkin Laboratories, and Peter Tan, Director of Quality Control *for United Vintners, Inc.*

Both the initial Eolkin Report, dated February 22, 1970, and the second Eolkin Report, dated June 1, 1971, identified the

problem experienced by HEUBLEIN with the premature ejection of champagne stoppers and suggested design alternatives to correct the problem. These alternatives included a Scott drilled stopper with air holes to vent the pressure, and a stopper coated with a pro-friction material. According to the first Eolkin Report: "The Scott drilled stoppers are generally superior to those currently in use but the 'pop' does not occur on opening."

The second Eolkin Report contains the following conclusions concerning the effectiveness of the coated stopper:

> 1. A stopper coating possessing a high friction characteristic was developed and has been tested on the Madera production line. *Preliminary indications are that it will solve the premature ejection problem.* (emphasis supplied)
> 2. The 'pro-friction' stopper makes possible, for the first time, a full safety container system.

Additionally, HEUBLEIN's Quality Control Director, Peter Tan, testified he could not recall any reported injuries caused by the product *when wood corks were in use,* but that after HEUBLEIN began using polyethylene stoppers, at least six injuries had been reported. The second Eolkin Report discussed the problem of polyethylene stoppers versus wood corks:

> Wood corks, when used in wine bottles, remain snug and tight. Polyethylene stoppers, with passage of time, remain snug but not tight.

This evidence, contained in the two Eolkin Reports, established that (1) HEUBLEIN was aware of the problem of premature ejection; (2) HEUBLEIN was advised of feasible design alternatives; (3) HEUBLEIN was aware that wood corks were safer than polyethylene stoppers, and (4) HEUBLEIN elected to continue using an undrilled and uncoated polyethylene stopper, inferentially to retain the festive "pop." We conclude this evidence, standing alone, was sufficient to require submission of the issue of negligent design to the jury. *See Kennedy v. Custom Ice Equipment Co., Inc.,* 271 S. C. 171, 246 S. E. (2d) 176 (1978). Additionally, respondent

offered the testimony of two experts, both mechanical engineers, on the issue of negligent design.

Dr. Rolin Barrett, of Raleigh, North Carolina, testified he had read the Eolkin Reports and had performed additional tests which established the feasibility of a drilled or vented stopper. He also testified concerning the feasibility of a design alternative using a tethered stopper which would prevent injury in the event of premature ejection.

Dr. James Somerset, a professor at Syracuse University, testified about the results of experiments he had performed using Jacques Bonet products. A filmed experiment conducted by Dr. Somerset was introduced into evidence to further illustrate the alleged propensity of Jacques Bonet sparkling wines to prematurely eject their stoppers.

In light of the conclusions contained in the Eolkin Reports and the expert testimony offered by Gasque, we hold that sufficient competent evidence existed to warrant submission of the issue of negligent design to the jury.

### 1.-B

#### Negligent Manufacture

The stopper which allegedly struck Gasque in the eye was introduced into evidence and was identified by several witnesses by an indentation or groove on its top. Respondent's expert, Dr. Barrett, testified the indentation distinguished it from other Jacques Bonet Cold Duck stoppers. Dr. Barrett testified the groove was caused by the improper attachment of the wire retainer to the stopper during manufacture, and that this manufacturing defect contributed to the premature ejection of the stopper. HEUBLEIN's own witness, Peter Tan, acknowledged the purpose of the wire retainer was to secure the stopper so it would not eject spontaneously.

We hold there was evidence from which the jury could have reasonably concluded appellants' improper placement of the wire hood on the stopper during bottling, as evidenced by the groove, proximately caused the stopper's premature ejection. The trial court properly submitted the issue of negligent manufacture for the jury's resolution.

## 1.-C

### *Negligent Inspection*

HEUBLEIN's Quality Control Director Peter Tan, testified that quality control personnel had one or two seconds to ascertain whether or not the wire hood was properly affixed to the stopper. Additionally, Tan testified a pressure check was performed upon only one out of every 30,000 to 40,000 bottles on the assembly line.

This testimony, when considered with respondent's evidence concerning the asymmetrical placement of the wire hood upon the stopper gave rise to the reasonable inference that HEUBLEIN's quality control personnel were negligent in their inspection of this particular bottle. We hold this issue was correctly submitted to the jury.

## 1.-D

### *Negligent Failure to Warn*

The following information is contained on the back of the Jacques Bonet Cold Duck bottle:

> CAUTION: Our sparkling wines contain natural high pressure and should be served well-chilled. Hold stopper firmly while removing wire, pointing bottle away from people.

The bottle with its warning was placed into evidence for the jury's consideration. HEUBLEIN's expert witness, Dr. Daniel Carroll, acknowledged the print size of the warning was approximately ⅛ the size of the print used to advertise the product's name. Additionally; the warning does not mention the premature ejection problem recognized by HEUBLEIN in its own studies, and which allegedly caused respondents injuries.

We hold the language of the warning itself, its placement on the back neck of the bottle and its print size created a jury question as to its adequacy. The trial court correctly submitted this issue to the jury.

2.

*Admission into Evidence of Filmed Experiment*

The general rule is that to be admissible at trial, an experiment or test must have been made under conditions and circumstances substantially similar to those prevailing at the time of the occurrence involved in the controversy. *Weaks v. South Carolina State Highway Department,* 250 S. C. 535, 159 S. E. (2d) 234 (1968). As noted in *Weaks, supra:* "It is not required that the conditions be identical with those existing at the time of the controversy; it is sufficient if there is a substantial similarity." 250 S. C. at 542.

Gasque introduced a filmed experiment conducted by Dr. James Somerset, wherein the stopper in a bottle of Jacques Bonet Champagne spontaneously ejected when Somerset began twisting the wire retaining hood. The trial judge allowed the jury to view the film after eliminating its audio portion.

HEUBLEIN asserts error in admitting the film into evidence because Dr. Somerset's experiment was not conducted under circumstances substantially similar to those existing at the time of the occurrence. Specifically, HEUBLEIN contends the sizes of the bottles were different, the bottle in the film contained Jacques Bonet champagne rather than cold duck, and the temperatures and handling of the two bottles were dissimilar. Although a magnum-size bottle was used in the film as compared to the fifth-size bottle involved in this case, Dr. Somerset testified the neck and stoppers of the two bottles were substantially the same, as were their pressure producing capabilities. The expert also stated the thermodynamic properties of champagne and cold duck were the same. Finally, he testified the champagne bottle he used had been refrigerated prior to the experiment as had the cold duck bottle involved in this case.

The introduction of evidence during trial is a matter addressed to the sound discretion of the trial judge, and his decisions will not be disturbed absent an abuse of discretion. *Holmes v. Black River Electric Coop., Inc.,* 274 S. C. 252, 262 S. E. (2d) 875 (1980); see cases collected in West's South Carolina Digest, Appeal and Error, Key No. 970(2). Moreover, the question of similarity of circumstances also lies

within the sound discretion of the trial judge. *Beasley v. Ford Motor Co.*, 237 S. C. 506, 117 S. E. (2d) 863 (1961); 29 Am. Jr. (2d), *Evidence* § 824, p. 914.

The distinctions urged by appellants did not affect the validity of the experiment or its admissibility. Appellants vigorously cross-examined Dr. Somerset on the differences between his experiment and the facts in the instant case, and the jury was entitled to those differences in deciding what weight to accord the film.

Additionally, the experiment was cumulative to other evidence adduced at trial, including the testimony of Gasque's friend who was opening the bottle, Gasque's expert witnesses, and the information contained in HEUBLEIN's own Eolkin Reports. We hold the conditions of the filmed experiment were substantially similar to those existing at the time of this occurrence; however, even if this were not the case, reversal would not be warranted due to the cumulative nature of this evidence. *See Beasley v. Kerr-McGee Chemical Corp., Inc.*, 273 S. C. 523, 257 S. E. (2d) 726 (1979).

### 3.

### Excessiveness of Verdict

This court has limited jurisdiction to interfere with the amount of verdicts. Our Supreme Court has repeatedly stated: "The proper amounts to be rendered, as actual or punitive damages, are left, under our law, almost entirely to the trial jury and the trial judge." *Charles v. Texas Co.*, 199 S. C. 156, 18 S. E. (2d) 719, 729 (1942), quoting from *Weeks v. Carolina Power and Light Co.*, 156 S. C. 158, 153 S. E. 119, 124 (1930).

This court cannot reduce a verdict, and will only strike down a verdict *in toto* in those rare cases where the amount is so shockingly excessive as to indicate it was the result of passion, caprice and prejudice. *Reid v. Swindler*, 249 S. C. 483, 154 S. E. (2d) 910 (1967); *Lucht v. Youngblood*, 266 S. C. 127, 221 S. E. (2d) 854 (1976). We do not have jurisdiction to correct mere undue liberality on the part of the jury; rather, that power rests with the trial judge alone who may set aside the verdict or reduce it by granting a new trial *nisi. Reid v. Swindler, supra; Mickle v. Blackmon*, 252 S. C. 202, 166 S. E. (2d) 173 (1969).

In personal injury cases, damages cannot be determined with any degree of certainty. *Haselden v. Atlantic Coast Line Railway Co.*, 214 S. C. 410, 53 S. E. (2d) 60 (1949); *Hutson v. Cummins*, 314 S. E. (2d) 19 (S. C. App. 1984). Moreover, in evaluating the alleged excessiveness of a verdict, each case should be determined on its facts.

Respondent Gasque sustained a severe and permanent injury to his left eye which brought a drastic change in his lifestyle. In view of the nature of his injury, we do not find the verdict of $750,000 actual damages to be excessive.

Gasque was hospitalized shortly after being struck in the eye by the stopper. The admitting diagnosis was traumatic hyphema, or bleeding of the anterior portion of the eye. The record is replete with references to the pain suffered by Gasque immediately following the incident. While hospitalized, he was placed on demerol and other pain medications. Gasque testified he continues to suffer pain due to the elevated pressure in his eye.

Dr. Gerald Tiller, the admitting ophthalmologist, testified that Gasque's eye pressure became elevated and an operative procedure was performed approximately one week following admission to relieve this pressure. A second and more extensive surgical procedure was performed several days later to remove the blood clot in the anterior segment of Gasque's eye.

When Gasque was discharged from the hospital, he could discern hand motion with his left eye. Dr. Tiller testified Gasque's condition deteriorated and that at the time of trial, he had developed a mature cataract, abnormal elevated pressure in the eye, and glaucoma. Dr. Tiller stated Gasque would require daily medication to control his eye pressure for the balance of his life.

Dr. Howard Stokes, an ophthalmologist with the Stokes Eye Clinic in Florence, South Carolina, testified that at the time of trial, Gasque's vision in his left eye had deteriorated to only light perception, characterized by Dr. Stokes as "the next step to total blindness." Both Dr. Tiller and Dr. Stokes testified Gasque would need treatment for his left eye every six months for the remainder of his life. Gasque was thirty (30) years old at the time of the injury. Dr. Stokes predicted the condition of Gasque's left eye would most probably degenerate.

Prior to injury, Gasque had 20-20 vision in his left eye. He testified that since the injury, he wears dark glasses, both to protect his eye and to hide its appearance. He also stated he had lost his peripheral vision and depth perception and that this affected his ability to engage in certain hobbies such as carpentry work and painting.

Prior to his injury, Gasque had been trained as an air traffic controller in the Navy and had earned a degree in Architectural Drafting. He testified he could no longer perform this work due to the strain it placed on his good eye. He also testified he was unable to engage in many sports and activities he had enjoyed prior to his injury, including piloting an airplane, snow skiing, and scuba diving.

In determining the amount of damages to award respondent, the jury was entitled to consider the permanency of Gasque's injury, his pain and suffering, the diminution of his earning capacity, his disfigurement, his psychological trauma, the alteration of his life-style, and his past and future medical care. Substantial testimony was introduced to support each of these elements of damage. Based upon the extent of the injury sustained by respondent, we do not find the jury award to be excessive.

Verdicts of similiar size for the loss of vision have been approved elsewhere. *See Bender v. Burlington-Northern R. Co.*, 654 S. W. (2d) 194 (Mo.App.1983) ($750,000 verdict); *Bevevino v. Saydjari*, 574 F.(2d) 676 (2nd Cir.1978) (award of $550,000); *Penetrante v. United States*, 604 F.(2d) 1248 (9th Cir.1979) (verdict for $900,000); *Richards Mfg. Co. v. Aspromonte*, 557 S. W. (2d) 543 (Tex. Civ. App. 1977) (verdict for $675,000); *Danaher v. Partridge Creek Country Club*, 116 Mich. App. 305, 323 N. W. (2d) 376 (1982) (verdict for $1,000,000).

Affirmed.

CURETON and GOOLSBY, JJ., concur.