0877

Cynthia E. BONAPARTE, Respondent-Appellant v. John S. FLOYD, III, M.D., Morey Lipton, M.D., and J. Price Cameron, Jr., M.D., Defendants-Respondents, of whom John S. Floyd, III, is Appellant.

(354 S. E. (2d) 40)

Court of Appeals

*J. W. Cabaniss* of *Grimball & Cabaniss,* Charleston, *for appellant.*

*Robert H. Hood,* and *Alexander M. Bullock* of *Robert H. Hood & Associates,* and *J. Rutledge Young, Jr.,* of *Young, Clement, Rivers & Tisdale,* Charleston, *for appellants-respondents.*

*Michael A. Scardate* of *Morris, Duffy & Boone,* Charleston, *for respondent-appellant.*

Heard Dec. 9, 1986.

Decided Feb. 9, 1987.

CURETON, Judge:

Cynthia E. Bonaparte commenced this medical malpractice action against Dr. John S. Floyd, III, Dr. Morey Lipton, and Dr. J. Price Cameron, Jr. for negligent diagnosis and treatment of a growth on her vulva. Dr. Lipton and Dr. Cameron were granted directed verdicts. The case was submitted to the jury against Dr. Floyd alone. The jury returned a verdict for Bonaparte of $70,000.00 actual damages. Dr. Floyd appeals the jury verdict, arguing insufficiency of evidence, abuse of discretion in the admission of certain evidence relating to damages, excessiveness of the verdict, and inconsistent verdicts. Bonaparte appeals the directed

verdicts in favor of Dr. Lipton and Dr. Cameron, and claims error in excluding certain evidence of medical costs and in admitting evidence of her health insurance coverage. We affirm the verdict against Dr. Floyd, reverse the directed verdicts granted to Lipton and Cameron and remand to the trial court.

Dr. Floyd, a gynecologist, removed a growth diagnosed as a fibrous histiocytoma from Bonaparte's vulva in 1977. This was a relatively simple procedure conducted on an outpatient basis. This type of growth is a low-grade, slow-growing sarcoma, for which excision is the proper treatment. It has a rare rate of occurrence, and a slight tendency to recur. Bonaparte returned to Dr. Floyd in January 1979, complaining that the growth had recurred. Dr. Floyd noted a possible recurrence but recommended no action. Bonaparte returned in March 1979, but Floyd again took no action. Upon her request for a second opinion, Dr. Floyd referred her to Dr. Lipton, a general surgeon, but did not send any of Bonaparte's medical records or inform Dr. Lipton of the pathology reports for the former growth.

Although Bonaparte informed Dr. Lipton she had had a "cyst?" removed, Dr. Lipton did not request her medical records nor inquire as to the type of growth removed. He diagnosed the growth as a keloid scar and recommended no action, but advised Bonaparte to return in three months. She did not return. Dr. Lipton informed Dr. Floyd of his diagnosis. Dr. Floyd continued to see Bonaparte over the next several years, but made few notations and no measurements of the growth in her records.

In March 1982, Dr. Floyd noted the growth had increased in size. He again referred Bonaparte to Dr. Lipton, who recommended no action. Upon Bonaparte's insistence, Dr. Lipton referred her to Dr. Cameron, a plastic surgeon. Dr. Cameron did not receive or request any information regarding the type of growth previously removed from Bonaparte's vulva. He also diagnosed a keloid scar and treated Bonaparte with steroid injections into the vulva. In July 1982, after this treatment provided no relief, Bonaparte requested a referral to have the growth removed. Dr. Floyd referred her to Dr. Schuh, a plastic surgeon. Dr. Schuh examined Bonaparte and obtained a medical history from her. He then

contacted Dr. Floyd who informed him a fibrous histiocytoma had been removed from that area in 1977. Dr. Schuh then biopsied the growth and the pathologist's report indicated a more aggressive growth known as a dermatofibrosarcoma protuberans. This type of tumor requires "wide removal" which is excision of the tumor with a two to three centimeter margin of tissue around the growth to insure that all of the tumor is removed.

Dr. Schuh referred Bonaparte to Dr. Lutz, a gynecological cancer surgeon. Dr. Lutz biopsied the tumor a second time. The pathology report again identified the tumor as a dermatofibrosarcoma protuberans. Dr. Lutz removed the tumor, measured at $6 \times 4 \times 1$ to 2cm, along with a wide margin of 2 to 3cm of vulvar tissue, a portion of the covering of the pubic bone, and nearby lymph nodes. Dr. Lutz testified the nodes were "palpable" or enlarged, which could indicate spread of a malignancy. Subsequent pathology reports indicate the tumor may have been a recurrent fibrous histiocytoma rather than a dermatofibrosarcoma protuberans. The surgery took three hours. Bonaparte was subsequently hospitalized for 20 or 21 days. She later received treatment for depression caused by disfigurement and emotional distress. She has had no additional recurrence of the growth and there is no indication that it has spread to other areas.

Bonaparte commenced this medical malpractice action against Drs. Floyd, Lipton, and Cameron in August 1984. She claimed the doctors had negligently failed to follow accepted medical procedure to diagnose and treat her condition, thereby permitting the tumor to increase in size resulting in more extensive surgery and hospitalization than would otherwise have been required. She sought damages for pain and suffering, disfigurement, and for medical, psychiatric and other expenses.

The case was tried in July 1985. Dr. Lipton and Dr. Cameron were granted directed verdicts. A jury verdict was returned against Dr. Floyd for $70,000.00 actual damages. Bonaparte and Dr. Floyd both appeal. We will consider the appeals separately.

# FLOYD'S APPEAL

## I.

Dr. Floyd first argues the court erred in failing to direct a verdict in his favor because there was no competent testimony to establish actionable negligence on his part. We reject this argument.

Floyd complains Bonaparte failed to show he deviated from the generally accepted standard of care exercised by competent physicians in the same or similar circumstances. He argues that Bonaparte's case rests solely on the conclusions of her expert witness, Dr. John R. Lurain, and that those conclusions are not supported by the facts or by Dr. Lurain's own stated opinions. He also maintains that Dr. Lurain was incompetent to testify as to the standard of care in this specialty in South Carolina and for the diagnosis and treatment of this type of tumor. Floyd bases this argument on the fact that Dr. Lurain had never examined Bonaparte, had never treated a fibrous histiocytoma or a dermatofibrosarcoma protuberans, had never treated a keloid, and had never practiced medicine in South Carolina.

We will address Dr. Lurain's qualification as an expert witness. At the time of the trial, Dr. Lurain was an associate professor of obstetrics and gynecology and director of gynecologic oncology at Northwestern University Medical School. He has published numerous scholarly works on this subject and maintains a private practice in addition to his teaching duties. Dr. Lurain was questioned extensively by all counsel and by the court before being qualified as an expert in the areas of diagnosis and treatment of vulvar tumors.

The qualification of a witness as an expert and the admissibility of his testimony on a fact in issue are matters largely within the discretion of the trial judge. *South Carolina Dept. of Social Services v. Bacot*, 280 S. C. 485, 313 S. E. (2d) 45 (Ct. App. 1984). Once qualified, the adequacy of the expert's knowledge goes to the weight of his testimony, not its admissibility. *Madden v. Cox*, 284 S. C. 574, 328 S. E. (2d) 108 (Ct. App. 1985), *appeal dismissed*, 286 S. C. 127, 332 S. E. (2d) 102 (1985). Given the demonstrated extent of Dr. Lurain's expertise, Dr. Floyd has failed to show an abuse of discretion in qualifying him as an expert.

We will now address the adequacy of the evidence demonstrating Dr. Floyd's negligence. To recover for medical malpractice, a plaintiff must show failure by a physician to exercise that degree of care and skill which is ordinarily employed by the profession under similar conditions and in like circumstances. *Welch v. Whitaker*, 282 S. C. 251, 317 S. E. (2d) 758 (Ct. App. 1984). This must be established by expert testimony unless the subject matter is of common knowledge or experience. *Clark v. Ross*, 284 S. C. 543, 328 S. E. (2d) 91 (Ct. App. 1985).

In this instance, Bonaparte introduced expert testimony to demonstrate Dr. Floyd's negligence in failing to diagnose and treat her tumor. Dr. Lurain testified in response to a detailed hypothetical question that there are standard methods of diagnosing vulvar area diseases to which all physicians treating those diseases should adhere. He noted that vulvar growths should be physically examined and biopsied. In his opinion, the removal of a fibrous histiocytoma from this site, together with the tumor's known propensity for recurrence, mandated a biopsy in 1979. Dr. Lurain also testified that a referring physician has a responsibility to furnish all relevant information necessary for proper diagnosis and treatment. Dr. Lurain's opinion was that, based on the facts of this case, there was a breach of the standard of care in the diagnosis and treatment of Bonaparte's tumor.

Dr. Lurain also testified that there is no difference in the standard of care for the diagnosis and treatment of vulvar conditions in Chicago, Illinois and Charleston, South Carolina, since both are large metropolitan areas with medical schools and large hospital centers. South Carolina has adopted a standard of care not bound by any geographical restrictions, under which locality is but one of the factors to be considered in determining the standard of care. *King v. Williams*, 276 S. C. 478, 279 S. E. (2d) 618 (1981). In our opinion, Dr. Lurain was qualified to give an opinion on the standard of care in this case, and his testimony shows Floyd breached that standard in failing to diagnose and treat Bonaparte's tumor.

Even assuming Dr. Lurain's testimony alone fails to present a jury issue on the question of Dr. Floyd's negligence,

his testimony, taken in conjunction with testimony of Drs. Schuh, Lutz and Rowland, clearly presents a jury question. Dr. Schuh, the plastic surgeon who saw Bonaparte in August 1982, testified that he contacted Dr. Floyd to discover what had been removed in the 1977 operation. He stated he did this in order to rule out a recurrent tumor before diagnosing the growth as a keloid, since certain tumors have a tendency to recur. Upon learning from Dr. Floyd that a fibrous histiocytoma had been removed from the area, he biopsied the growth to determine whether there was a recurrence. Dr. Lutz, the surgeon who removed the growth, also testified that he biopsied the growth immediately as part of his diagnostic procedure. Even Dr. Rowland, a gynecologist who testified as Dr. Floyd's expert witness, testified at one point that he would have biopsied or excised the growth rather than refer it; that he would have communicated the 1977 operation and pathology report to the consulting physician, and that he would have placed measurements of the growth on Bonaparte's records if he were following its progress.

Moveover, Dr. Floyd's testimony and medical records demonstrate he noted a possible recurrence of the fibrous histiocytoma in January 1979, yet failed to biopsy the growth, to properly refer Bonaparte with her records, to question the keloid diagnosis, and to keep updated measurements of the growth over a three year period. As the judge noted in refusing to grant Dr. Floyd a JNOV or a new trial, "there was a lot of testimony with reference to a deviation from the standard of care in the community" apart from Dr. Lurain's testimony.

Finally, Dr. Floyd argues in his brief that even though he may have been negligent in failing to forward the pathology report to Dr. Lipton, such negligence was not the proximate cause of Bonaparte's injuries. A plaintiff must show injury proximately caused by the defendant's negligence. *Hanselmann v. McCardle,* 275 S. C. 46, 267 S. E. (2d) 531 (1980).

Dr. Floyd does not, however, argue the other alleged acts of negligence attributed to him were not proximate causes of the injuries. Aside from his failure to forward the pathology report, the record reveals evidence that Dr. Floyd, despite noting in 1979 a possible recurrence

of the fibrous histiocytoma, failed to biopsy the growth. He also failed to question Dr. Lipton's diagnosis of a keloid, despite his original suspicions of a recurrence of the tumor. He followed the growth's progress from 1979 to March 1982, yet never measured it and made few notations of it in Bonaparte's medical record. In March 1982 he noted the growth's increased size, yet once again did not biopsy it, but instead referred Bonaparte to Dr. Lipton.

Dr. Floyd admitted that, had he done a biopsy in 1979 which showed a fibrous histiocytoma, he would have removed the growth. He also admitted that, at that point, the operation could have been conducted in the outpatient department, the same as the 1977 excision. He admitted that Bonaparte had to undergo more extensive surgery in 1982 than would have been necessary in 1979. Dr. Lurain also testified that the growth of the tumor over a three year period required a much larger operation to remove a tumor which had increased in size with a corresponding increase in tissue loss, disfigurement, hospitalization, medical costs and loss of income during recovery.

The evidence of Dr. Floyd's acts of negligence presented a jury question of whether they were a proximate cause of Bonaparte's injuries. Ordinarily, the question of proximate cause is a jury issue. *Carter v. Anderson Memorial Hospital,* 284 S. C. 229, 325 S. E. (2d) 78 (Ct. App. 1985).

A jury verdict must be sustained if any evidence reasonably supports the jury's findings. *McGaha v. Mosley,* 283 S. C. 268, 322 S. E. (2d) 461 (Ct. App. 1984). Based on the reasons stated, we affirm the admission of Dr. Lurain's testimony and the jury verdict against Dr. Floyd.

II.

Dr. Floyd next argues evidence of the cost of Bonaparte's 1977 treatment, the cost of the 1982 operation, and testimony of psychiatric treatment following the 1982 procedure were erroneously admitted.

Dr. Floyd essentially argues that the 1982 operation was much larger in scope due to the diagnosis of a possible dermatofibrosarcoma protuberans, not due to a supposed delay in diagnosis. He argues there was no competent testi-

mony to establish the cost of a "wide excision" in 1979, and the admission of the two hospital bills permitted speculation and conjecture. Dr. Floyd's argument is misplaced.

Without objection, Bonaparte introduced Dr. Floyd's bill for the 1977 excision to give a complete cost of that procedure.[1] Dr. Floyd admitted that the 1979 growth, if then discovered, could have been removed "like we did in 1977" on an outpatient basis without any hospitalization or extensive recovery time.

The expenses associated with the 1982 operation, as contrasted to the 1977 operation, were relevant to the jury's determination of Bonaparte's damages. Relevancy of evidence means the logical relation between the proposed evidence and a fact to be established. *Winburn v. Minnesota Mutual Life Insurance Co.*, 261 S. C. 568, 201 S. E. (2d) 372 (1973). It is well-settled that the admissibility or exclusion of evidence is within the sound discretion of the trial judge. *Hall v. Palmetto Enterprises II, Inc. of Clinton*, 282 S. C. 87, 317 S. E. (2d) 140 (Ct. App. 1984). The exercise of the judge's discretion will not be disturbed on appeal absent a clear showing of an abuse of discretion, the commission of legal error in its exercise, and prejudice to the rights of the appellant. *Id.* No abuse of discretion has been demonstrated.

Floyd also argues Dr. Rosen's testimony does not demonstrate Bonaparte's depression was "most probably" the result of the operation. He argues that even if the operation was the primary cause of the depression, there is no indication that had the operation been performed at an earlier date the depression would have been different in scope or Bonaparte's other personal problems would not have played their part.

We note first that Floyd does not assert error in the admission of evidence regarding the psychiatric treatment. The short answer to this argument is that we have no way of knowing that the jury awarded damages to Bonaparte for her depression. Moreover, aside from Dr. Rosen's testimony, there was other evidence from Bonaparte and hospital nurses that the operation caused her depression. This evi-

---

[1] While Dr. Floyd states in his brief that he objected to admission of the 1977 bill, no such objection appears in the record.

dence, when combined with Dr. Rosen's testimony, meets the "most probably" test.

### III.

Dr. Floyd next argues that the jury verdict against him is "inconsistent" with the court's directed verdicts in favor of Drs. Lipton and Cameron. Because we reverse the directed verdicts for Drs. Lipton and Cameron, this argument is now moot.

### IV.

Finally, Dr. Floyd argues the verdict was excessive and should have been set aside or he should have been granted a new trial *nisi.* We reject this argument.

Bonaparte's evidence shows monetary damages of $9,728.00 consisting of the cost of the operation, lost wages during the ten week period of time she missed work, and previous psychiatric bills. This figure does not include such elements as pain and suffering and disfigurement.

The amount of actual damages to be awarded is peculiarly within the judgment and discretion of the jury, subject to the supervisory power of the trial judge over jury verdicts. *Hicks v. Herring,* 246 S. C. 429, 144 S. E. (2d) 151 (1965). If the trial judge in the exercise of his discretion is convinced that the amount awarded is over-liberal, he has the authority to set the verdict aside or reduce it by granting a new trial *nisi. Id.* It is only when the verdict is so grossly excessive as to indicate that the jury was moved by passion or prejudice or other considerations not founded on the evidence and the instructions of the trial court that it becomes the duty of this Court, as well as the trial court, to set it aside absolutely. *Haltiwanger v. Barr,* 258 S. C. 27, 186 S. E. (2d) 819 (1972); *Gasque v. Heublein, Inc.,* 281 S. C. 278, 315 S. E. (2d) 556 (Ct. App. 1984).

The $70,000.00 award in this case does not indicate an excessive verdict under this standard. We, therefore, affirm the jury verdict on damages.

### BONAPARTE'S APPEAL

### I.

Bonaparte first argues the court erred in granting Dr. Lipton's motion for a directed verdict. We agree.

In reviewing the granting of the motion for a directed verdict, this Court must view the evidence and all the inferences reasonably deducible therefrom in a light most favorable to Bonaparte. *Vacation Time of Hilton Head Island, Inc. v. Lighthouse Realty, Inc.,* 286 S. C. 261, 332 S. E. (2d) 781 (Ct. App. 1985). If the evidence yields more than one inference then the motion for a directed verdict should be denied. *Id.*

In a medical malpractice case, a plaintiff must establish failure by a physician to exercise that degree of care and skill ordinarily performed by the profession under similar conditions and in like circumstances. *Welch v. Whitaker, supra.* This must be established by expert testimony unless the subject matter is of common knowledge or experience. *Clark v. Ross, supra.*

Dr. Lipton, using the same arguments as Dr. Floyd, argues that because of the technical nature of this case it was incumbent upon Bonaparte to introduce expert testimony demonstrating the proper standard of care and a departure from this standard. Dr. Lipton, a general surgeon, argues that Dr. Lurain was incompetent to give expert testimony in this case because he had never seen Bonaparte or examined the pathology slides, had never treated a keloid scar, practiced in a different locality, and had no experience in diagnosing and treating a fibrous histiocytoma or a dermatofibrosarcoma protuberans.

Dr. Lipton also argues that Dr. Lurain is not familiar with the standard of professional medical care of a general surgeon. The fact that a witness is not a specialist in the particular branch involved affects only the weight of the witness's testimony, and affords no basis for completely rejecting it. *Brown v. La France, Ind., A Div. of Riegel Textile Corp.,* 286 S. C. 319, 333 S. E. (2d) 348 (Ct. App. 1985). The qualification of a witness as an expert and the admissibility of his testimony are matters within the trial judge's discretion. *South Carolina Dept. of Social Services v. Bacot, supra.* We find the trial judge committed no abuse of his discretion in qualifying Dr. Lurain as an expert on the standard of care.

The record shows that Dr. Lipton saw Bonaparte on a referral from Dr. Floyd. Bonaparte, in completing her medical history form in Dr. Lipton's office, indicated

she had had a "cyst?" removed from her vulva. Dr. Lipton, who had received no medical records or information from Dr. Floyd, did not request any information. He did not attempt to determine what type of "cyst" had been removed, and did not biopsy the present growth to make his diagnosis. He concluded instead that the growth was a keloid and recommended no treatment.

Dr. Lurain testified that proper diagnosis and treatment of vulvar tumors are the same for all specialities because there are standard methods of diagnosing and treating vulvar area diseases to which all physicians should adhere. He stated that since several different conditions of the vulva appear very similar yet require totally different treatments, the appropriate method of diagnosing vulvar tumors in almost all cases is to biopsy them. He testified in response to a hypothetical question that in this situation the patient's past history of a fibrous histiocytoma removal from this site, and the fact that Bonaparte had no other keloids despite having pierced ears and other past injuries, indicated the growth was not a keloid and a recurrent fibrous histiocytoma should not be ruled out. Dr. Lurain also testified that as a proper standard of care, a consultant must obtain all of the information necessary for his diagnosis, including past medical records and pathology reports. Dr. Lurain concluded that in his opinion, Dr. Lipton had deviated from the standard of care in failing to properly diagnose and treat Bonaparte.

In addition to Dr. Lurain's testimony, Dr. Lipton admitted that the proper treatment for fibrous histiocytomas was excision, which should be done "when the patient comes to you and you get it scheduled." The record also reveals testimony from Dr. Schuh, the gynecologist who finally biopsied and diagnosed the tumor, and Dr. Lutz, the surgeon who also biopsied and actually removed the tumor, that a biopsy is the appropriate way to diagnose vulvar growths. Dr. Schuh also testified that, upon Dr. Floyd's referral of Bonaparte to him, he requested information on the prior operation from Dr. Floyd and thus determined that a fibrous histiocytoma had previously been removed, and therefore a biopsy was required to rule out a recurrence.

In our opinion the record contains evidence that Dr. Lip-

ton was negligent in failing to properly diagnose and treat Bonaparte's condition.

We also conclude the record contains evidence that Dr. Lipton's negligence proximately caused injury to Bonaparte, thereby presenting a jury question. *See, Carter v. Anderson Memorial Hospital, supra; Hanselmann v. McCardle, supra.* To establish negligence, the plaintiff is required to prove the defendant's conduct was one of the proximate causes of the injury, not the sole cause. *Hughes v. Children's Clinic, P.A.*, 269 S. C. 389, 237 S. E. (2d) 753 (1977).

Dr. Lurain testified that if the operation had been performed in 1979 when the tumor first appeared and when Dr. Lipton first examined Bonaparte, it could probably have been done as an outpatient procedure or required two or three days hospitalization at most. Dr. Floyd had testified the growth in 1979 could have been removed in the same manner as the 1977 tumor, which was excised in an outpatient procedure. Dr. Lurain testified the tumor in 1982 was two and one-half times larger than in 1979 when Dr. Lipton first examined Bonaparte, yet Dr. Lipton simply reiterated his keloid diagnosis and again recommended no treatment. The delay in properly diagnosing and treating this tumor resulted in a more complex operation requiring additional loss of tissue and removal of the lymph nodes, resulting in a longer hospital stay and recovery period, more disfigurement, greater cost, and loss of income during the recovery period.

The record reveals sufficient evidence of Dr. Lipton's negligence and the resulting injury to Bonaparte to submit the case to the jury. We, therefore, reverse the directed verdict granted to Dr. Lipton and remand to the lower court.

## II.

Bonaparte next argues the court erred in granting Dr. Cameron a directed verdict. We agree.

Dr. Cameron's counsel conceded at oral argument that Dr. Cameron was negligent in not obtaining Bonaparte's medical records and in failing to biopsy the growth. He argued, however, that despite evidence of negligence, Bonaparte could not recover against Dr. Cameron because she had failed to demonstrate any resulting damages. The trial judge agreed with this argument in granting the directed verdict.

In our opinion, the record contains sufficient evidence ■ of damages resulting from Dr. Cameron's negligence to submit the case to the jury. There is conflicting evidence in the record which could have led the jury to infer that from the time Dr. Cameron first saw Bonaparte in March 1982 to the time of removal in September 1982, the tumor grew from 4 × 2cm as recorded in Dr. Cameron's notes to 6 × 4 × 1.5 to 2cm as recorded in Dr. Lutz's records. The damage which would occur from leaving a tumor to grow for several months may not require expert testimony to present a jury question. *See, Simmons v. Mullen,* 231 Pa. Super. 199, 331 A. (2d) 892 (1974); *Welch v. Whitaker supra.* Even if expert testimony were required, Dr. Lurain, Dr. Lutz, and even Dr. Floyd as a matter of "common sense," testified that a larger tumor required removal of more tissue. In this case there was expert testimony that demonstrated that due to its growth, removal of the tumor also necessitated the removal of a 2 to 3cm margin of healthy vulvar tissue all around the tumor, the removal of adjacent lymph nodes which had become palpable, indicating a possible spread of a malignancy, and removal of a portion of the covering of the pubic bone, all of which added to the disfigurement suffered and the necessary recovery time.

There was also evidence of Bonaparte's emotional problems attendant to the operation and its disfigurement and the recovery necessary for such a complex procedure. The jury could have considered these as part of such damages which the delay in correct diagnosis and treatment of this tumor occasioned.

Finally, at the very least there was testimony from which the jury could have inferred Bonaparte merited damages for pain and suffering as a result of the painful and completely unnecessary steroid injections Dr. Cameron injected into the vulva for treatment of her "keloid" over a four month period. Bonaparte testified the injections were extremely painful. Dr. Cameron testified she complained of the pain, concluding that she had "a very low pain threshold." He admitted that the vulva could be a sensitive area, and that he had never injected steroids into a patient's vulva before. Counsel argues that such injections are the appropriate treatment for keloids. Since a correct diagnosis would have

revealed the growth to be a tumor, not a keloid, this argument is without merit.

The question of proximate cause is ordinarily one of fact for the jury. *Carter v. Anderson Memorial Hospital, supra.* Based on the evidence of damages in the record, we reverse the directed verdict in favor of Dr. Cameron.

### III.

Bonaparte next argues the trial judge erred in allowing evidence regarding her medical insurance coverage. She claims this was done without sufficient foundation and in violation of the collateral source rule. We disagree.

Bonaparte testified on direct examination that she neglected follow-up visits to her surgeon, Dr. Lutz, and her psychiatrist, Dr. Rosen, because she was financially unable to continue seeing them. The trial judge permitted opposing counsel to cross-examine Bonaparte regarding her medical insurance coverage of visits to these two physicians in order to impeach her prior testimony. Where such evidence has relevance to the witness's credibility, it has been held admissible. *See, Powers v. Temple,* 250 S. C. 149, 156 S. E. (2d) 759 (1967); *cf., Rauch v. Zayas,* 284 S. C. 594, 327 S. E. (2d) 377 (Ct. App. 1985) (Court upheld admission of settlement of a prior Workers Compensation claim to impeach personal injury plaintiff's testimony of pain and suffering as a result of a later accident).

The admission of evidence is within the sound discretion of the trial judge and will not be disputed on appeal absent a clear showing of an abuse of discretion, commission of a legal error, and prejudice to the appellant's rights. *Hall v. Palmetto Enterprises II, Inc., of Clinton, supra.* No abuse of discretion has been demonstrated. Indeed, since the jury returned a $70,000.00 verdict for Bonaparte, there is no evidence that she suffered any prejudice constituting grounds for reversal even if error was committed in this ruling. *Sturkie v. Sifly,* 280 S. C. 453, 313 S. E. (2d) 316 (Ct. App. 1984). The trial judge's ruling is affirmed.

### IV.

Finally, Bonaparte argues the trial judge committed error in excluding her prescription bills and the surgeon's bill for the 1982 operation. We disagee.

The Roper Hospital bill for the 1982 operation, Dr. Lutz's surgery bill, and prescription receipts were marked only for identification during Bonaparte's direct examination. The trial judge sustained opposing counsels' objections to admitting these bills into evidence until Bonaparte had established the proper foundation that the operation costs were a result of the defendants' negligence, and that the costs were greater than they would have been had the surgery been performed at an earlier time.

Bonaparte argues the surgeon's bill was relevant evidence since the extensive 1982 operation would not have been necessary had the growth been removed in 1979. The prescription receipts for October 11, 1982 through December 28, 1983 were proffered as costs of the operation as compared to the seven day prescription of antibiotics needed following the outpatient procedure in 1977.

The record on appeal indicates only that Bonaparte subsequently attempted to introduce into evidence the hospital bill, which had previously been marked for identification only. We cannot see from this record any attempt to introduce into evidence the 1982 physicians' bills and prescription receipts. Bonaparte, as the appellant on this issue, had the burden of furnishing a sufficient record for this Court's review. *Sweatt v. Norman,* 283 S. C. 443, 322 S. E. (2d) 478 (Ct. App. 1984). In the absence of such a record, this issue cannot be considered on appeal. *Id.*

Based on the reasons set forth above, we reverse the directed verdicts granted to Dr. Lipton and Dr. Cameron, and affirm the jury verdict against Dr. Floyd. The case is remanded for further proceedings consistent with this opinion.

Affirmed in part, reversed in part and remanded.

BELL and GOOLSBY, JJ., concur.