536 A.2d 1203

**Kimberly Van Voorhis DECHELLO**

v.

**JOHNSON ENTERPRISES, et al.**

**No. 845, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Feb. 10, 1988.
Certiorari Denied May 31, 1988.

Joseph M. Mott, Bethesda (Kenneth R. West, Silver Spring, on the brief), for appellant.

Warren D. Stephens (McCarthy, Bacon, Costello & Stephens, on the brief), Landover, for appellee, Albert E. Pecora.

Thomas B. Conway (Nancy L. Harrison, on the brief), Annapolis, for appellee, Johnson Enterprises, Inc.

Argued Before WILNER, ROBERT M. BELL and WENNER, JJ.

WILNER, Judge.

Appellant was injured when a plastic stopper allegedly flew off a bottle of Asti Spumante sparkling wine and hit her in the eye. In the Circuit Court for Prince George's County, she sued the retailer who sold her husband (then her fiance) the bottle of wine and the importer who purchased the bottle from the manufacturer and sold it to the retailer. She did not sue the manufacturer/bottler of the wine.

According to appellant, when her fiance brought the bottle home, she removed it from the bag, briefly examined it, and placed it on the kitchen counter. While it was on the counter, she removed the foil and the wire basket from the top of the bottle. She then turned to throw the foil and wire into the wastebasket. As she turned back and reached for the bottle, the stopper spontaneously ejected and struck her in the eye.

Appellant's amended complaint contained three counts. The gravamen of Count I, captioned "Strict Liability—Failure to Warn," was, indeed, the failure to warn of a dangerous condition. She alleged that the bottle was "in a defective condition unreasonably dangerous to the plaintiff in that it failed to contain any warning of the latent risks inherent in such product and the use thereof," that "[t]he defendants knew or should have known of the latent risks and dangers associated with carbonated wines, of which

plaintiff was unaware, but failed to provide any warning whatsoever of such risks and dangers, despite minimal cost to do so," and that "[a]s a direct and proximate result of defendants' failure to warn of the defective and unreasonably dangerous condition of the bottle and its contents, plaintiff sustained severe and permanent injury to her eye."

Nothing was said in Count I about either a design or manufacturing defect.

Count II, captioned "Negligence," was voluntarily dismissed by appellant at the beginning of trial and is therefore not directly relevant to this appeal. We observe, however, that it too was based essentially on the failure to warn. Appellant averred that the defendants knew or should have known that the bottle was unreasonably dangerous for the use for which it was supplied and that consumers would not realize its dangerous condition, that the defendants had a duty "to warn of the dangers inherent in sparkling carbonated wine" and that they breached that duty by "failing to exercise reasonable care to inform plaintiff of the dangerous condition...."

Count III was based on breach of implied warranty of merchantability under Md.Code Ann.Comm.Law art., § 2–314. Appellant incorporated by reference all previous allegations in the amended complaint and further averred that the defendants were merchants or sellers for purposes of § 2–314, that they warranted that the bottle was fit for ordinary purposes and was adequately contained, packaged, and labeled, and that that warranty was breached because the bottle was "in a defective condition unreasonably dangerous to the plaintiff."

In support of her case, appellant called two experts— James Green, an engineer, and Robert Cunitz, a psychologist. Mr. Green said that he conducted experiments on nine bottles of Asti Spumante wine—four from one "lot," five from another. He chilled the bottles to 48° F, removed the foil and the wire baskets, set the bottles on a level device outside his home, brought them up to 68° F (ambient room

temperature) and observed what happened. In the first lot of four bottles, each stopper ejected spontaneously; the stoppers in the second lot did not eject "without me forcing them out at room temperature." Upon ejection, the stoppers flew straight up and hit the eave of Mr. Green's roof, which, using a surveyor's tape, he calculated was "approximately 20 feet in height." By timing the flight of the stoppers, Green determined the velocity of the stopper in flight to be "approximately 34 miles per hour at the end of the 20 feet."

Five of the nine stoppers (three from the first lot of four bottles and two from the second lot of five bottles) were lost in the woods behind Green's house. After sending a report of his observations to appellant's counsel, Green decided to measure the rings on the four remaining stoppers. He discovered that the one stopper he still had from the lot of four bottles—the one that spontaneously ejected —was smaller than the average of the three stoppers he had remaining from the lot of five bottles that did not spontaneously eject.[1] Four of the five rings on the stopper that struck appellant were smaller than the corresponding rings on the four stoppers he had left from his experiment.

Finally, Mr. Green determined that there was a variance in the size of the corresponding rings from one stopper to another of between 0.001 and 0.055 inches. He concluded that there should not be a variance of more than 0.001 inches, and from that opined that (1) there was poor quality control during the manufacturing process and (2) the capping on the bottle that struck appellant was defective.

On cross-examination, Mr. Green conceded that he was unaware of any official or industry-wide standards regarding allowable variations in the stoppers, that he was not an

---

**1.** Each stopper had five rings, or raised portions. Although each ring on the spontaneously ejecting stopper was smaller than the *average* of the corresponding rings on the three other stoppers, three of the rings were actually larger than the corresponding ring on at least one of the other stoppers.

expert in plastics, and that he did not know why a manufacturer would want to use a plastic stopper.[2]

Dr. Cunitz, testifying as a "human factors psychologist," opined that a bottle of Asti Spumante wine is defective unless it contains a warning and that it was economically feasible to put a warning label on the bottle.

Though deprecating the evidence produced by appellant and disputing the conclusions sought to be drawn from it, defendants produced little evidence of their own.[3] They simply argued that the accident could not have happened as appellant alleged, suggesting to the jury that appellant must have been trying to open the bottle, or at least have had it pointing toward her head, when the stopper ejected. That argument was apparently persuasive, as the jury returned a defendants' verdict.

Aggrieved by the judgment entered on that verdict, appellant has brought this appeal, complaining that:

"1. The court should [have] enter[ed] judgment in favor of the appellant notwithstanding the verdict of the jury and order[ed] a partial new trial on damages because the appellant conclusively established that she was injured by a defective and unreasonably dangerous product and the appellees did not introduce any evidence at the trial to refute appellant's evidence."

---

2. With respect to the existence of any general standards, see 3B L. Frumer and M. Friedman, *Products Liability,* § 48.19 [12][b]: "Despite the significant number of serious eye injury cases there are no applicable standards for the design of champagne and sparkling wine bottles and their closures." See also D. Eolkin and P. Tan, *Premature Ejection of Champagne Stoppers,* cited in *Gasque v. Heublein, Inc.,* 281 S.C. 278, 315 S.E.2d 556 (App.1984).

3. The importer, Albert Pecora, testified that plastic stoppers were used in sparkling wine in part because they are cheaper than wood cork and also because "cork can cause the wine to go bad." He said that the wire basket was a safety device "to hold the cork in place so it will not blow out through transportation and before it is used." He also described briefly the importing business, how he gets the wines he imports.

and

"2. The judgment of the Circuit Court should be reversed and a new trial granted to the appellant because the trial court erroneously instructed the jury regarding the law of strict liability and warranty of merchantability."

This case was not well tried; indeed, it was substantially misdirected. Appellant sought to prove facts and theories that she never pled and offered suspect and uncompelling evidence to support her new theories. The court allowed her to do that and then compounded the problem by giving instructions to the jury that were hopelessly confusing. On this record, we find no merit whatever in appellant's first complaint, but, because the jury instructions were so jumbled and confusing, we shall remand the case for a new trial. We do this with some reluctance because a good bit of the confusion was engendered by the presentation of appellant's case, but the result is required nonetheless.

### (1) Liability As A Matter Of Law

Appellant's first argument goes too far; she says, in effect, that, on the evidence before the court, she was entitled to judgment as a matter of law. We do not agree.

Unfortunately in this case, as in a number of product liability cases, the theories of liability asserted by the plaintiff in her pleadings became a bit muddled as the trial proceeded. As a preliminary matter, then, it is necessary to disentangle them and restate the bases on which the plaintiff sought to recover.

■ Count I, as we observed, claimed no more than a failure to warn; the "defective condition" complained of was the failure "to contain any warning of the latent risks inherent in [the] product and the use thereof." The strict liability action was *not* based on any alleged defect in either design or manufacture. Count III, based on breach of implied warranty under Comm.Law art., § 2–314, raised in a general way the issue of the condition of the bottle and its stopper. The implied warranty of merchantability includes

a warranty that the goods "[a]re fit for the ordinary purposes for which the goods are used" and that they are "adequately contained, packaged, and labeled as the agreement may require." § 2–314(2)(c) and (e). Liability under § 2–314 has been found where the user is injured by defects in the packaging as opposed to defects in the contents on the theory that, if the container is defective and causes injury, the product is not adequately packaged and is not fit for its ordinary use. See *Giant Food, Inc. v. Wash. Coca-Cola,* 273 Md. 592, 332 A.2d 1 (1975); 3 R. Anderson, *Uniform Commercial Code* § 2–314:35; Prosser and Keaton, *The Law of Torts,* 5th ed., § 99, p. 694.

In showing a breach of implied warranty, the plaintiff does not have to establish that the defect is particularly one of design or manufacture; as with strict liability, culpability can arise from a failure to warn. As pointed out in *Hayes v. Ariens Co.,* 391 Mass. 407, 462 N.E.2d 273, 277 (1984), "Even if a product is properly designed, it is unreasonably dangerous and, therefore, it is not fit for the purposes for which such goods are used, if foreseeable users are not adequately warned of dangers associated with its use...." (Citation omitted.) See also *Reid v. Eckerds Drugs, Inc.,* 40 N.C.App. 476, 253 S.E.2d 344, 349 (1979); *Wolfe v. Ford Motor Co.,* 6 Mass.App. 346, 376 N.E.2d 143 (1978); 3 R. Anderson, *Uniform Commercial Code,* § 2–314:75.[4]

The averment in Count III as to dangerousness was a general one; there was no specific statement of how the

---

4. Most courts and commentators have recognized the significant overlaps in the two theories. See discussion in Anderson, *supra,* § 2–314:50. Although, as Anderson observes, a number of courts "seek to restrict warranty liability to recovery for commercial or economic loss and to restrict strict tort to recovery for damage claims to person or property," *id.,* § 2–314:50, p. 156, Maryland has not, as of yet, adopted that approach but has continued to recognize both theories as independent, parallel, bases of recovery. See *Phipps v. General Motors Corp.,* 278 Md. 337, 348–53, 363 A.2d 955 (1976); compare Annot., *Pre-emption Of Strict Liability In Tort By Provisions Of UCC Article 2,* 15 A.L.R.4th 791 (1982).

bottle was dangerous, what its particular defect was. By incorporating the allegations of Counts I and II, however, appellant seemingly regarded the defective condition as arising solely from the lack of a proper warning.

■ Maryland has long recognized a duty on the part of sellers to warn of latent dangers attendant upon a proper use of the products they sell, where injury is foreseeable. The standard applied in that regard, under all three theories of negligence, breach of implied warranty, and strict liability, has been that stated in *Restatement (Second) of Torts* § 388. See *Katz v. Arundel, Etc. Corp.*, 220 Md. 200, 203, 151 A.2d 731 (1959); *Twombley v. Fuller Brush Co.*, 221 Md. 476, 492, 158 A.2d 110 (1960); *Moran v. Faberge*, 273 Md. 538, 544, 332 A.2d 11 (1975). Section 388 states:

"Chattel Known to be Dangerous for Intended Use

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

That stoppers can spontaneously eject from bottles of sparkling wine at great velocity has been fairly well documented and indeed is virtually acknowledged in this case. Mr. Green found that the stoppers from the bottles he tested ejected at a speed of 34 miles per hour and could strike an object 20 feet away with 12 pounds of force. In

another case, evidence showed that cold champagne may eject a stopper with a momentum of 63% of that of a .22 caliber pistol firing a short cartridge. See *Shuput v. Heublein, Inc.,* 511 F.2d 1104, 1106 n. 1 (10th Cir.1975). See also 3B *Products Liability, supra,* n. 1, § 48.19[12][b][ii], reciting experiments showing velocities of up to 40 miles per hour for stoppers ejecting from champagne bottles stored at 32° F, and Eolkin and Tan Reports noted in n. 2, *ante.* A number of courts have concluded that that propensity can suffice, at least for purposes of strict liability under *Restatement (Second) of Torts,* § 402A, to make the bottle unreasonably dangerous, and that a failure to give adequate warning of the danger can create liability. See *Gasque v. Heublein, Inc., supra,* 281 S.C. 278, 315 S.E.2d 556; *Shuput v. Heublein, Inc., supra,* 511 F.2d 1104; and cf. *Murray v. Almaden Vineyards, Inc.,* 429 So.2d 24 (Fla.App.1983), and *Burke v. Almaden Vineyards, Inc.,* 86 Cal.App.3d 768, 150 Cal.Rptr. 419 (1978); *compare Cosgrove v. Estate of Delves,* 35 A.D.2d 730, 315 N.Y.S.2d 369 (1970).

The cases finding that prospect of liability each turned on their respective facts, however, the appellate court concluding no more than that, on the facts before it, a jury question was presented as to the dangerousness of the product, the duty to warn, the adequacy of a warning given, or whether the plaintiff acted reasonably under the circumstances. See, for example, the discussion in *Shuput, supra,* 511 F.2d at 1106:

"We consider that plaintiff's evidence was obviously sufficient *to allow the jury to find* that defendant's product contained an unreasonable danger or hazard to the consumer and was thus defective, and that defendant did not remedy this defect by labeling the bottle to give adequate warning of that danger. No warning of any kind was given. The duty to warn, however, does not extend to a perfectly obvious hazard but we do not consider this to be such a case. The propensities of bubbly wine may be well known to many but are not a matter of such common

knowledge *as to be established as a matter of law* and imposed as a matter of judicial knowledge. The court erred in so doing as a basis for directing a verdict." (Emphasis added.)

This case, of course, was submitted to the jury. Though approaching the issue from the opposite direction, appellant makes essentially the same argument rejected in *Gasque* and *Shuput*—that, on the evidence, the issue should have been resolved as a matter of law. The evidence here was not of that character, however.

Appellant insisted that the stopper spontaneously ejected as the bottle sat upright on the counter; that spontaneous ejection constituted the heart of her claim of dangerousness. She also maintained that, at the time, she was neither touching the bottle nor leaning over it, but that the stopper nevertheless flew directly into her eye. The jury was not obliged to believe that testimony, however, and indeed there was good reason for the jury not to believe it. For the accident to have occurred in that manner, the stopper would have had to follow a trajectory not allowed by Newton's first law of motion.[5] Unaffected by any other force and without benefit of ricochet, it would have had either to eject from the bottle at an angle, which Mr. Green stated does not happen, or arc in mid-air before traveling more than a few feet, which would be inconsistent with both the laws of physics and the testimony of Mr. Green.

In pressing her first complaint, appellant seemingly fails to appreciate the significance of that improbability. If the accident did not occur as testified by her, how did it occur? Using their common experience—and notwithstanding the lack of any evidence showing it—the jury may well have believed that the stopper ejected as appellant, either leaning over the counter or cradling the bottle in her arm, twisted or pushed on the stopper in an attempt to remove it, and that, at the time she was engaged in this endeavor, the

---

5. Essentially, if there is no force acting on an object in motion, the object will continue to move *in a straight line* with constant velocity.

bottle was pointed straight at her head. Rejecting her testimony and the rather fragile conclusions drawn from Mr. Green's backyard experiments, the jury could well and properly have concluded that the stopper did *not* spontaneously eject but popped out only upon manipulation, as it was supposed to do, and that the bottle was therefore not unreasonably dangerous.

The jury also had before it appellant's admission that she had consumed sparkling wines on some 20 occasions before this accident, that she was aware that the carbonation caused corks to "pop," having seen that occur on television, and that she had herself previously opened at least one bottle of sparkling wine. If it was inclined to discredit appellant's version of how the incident occurred but to believe instead that appellant was holding the bottle or had it facing her head, it may have found that, knowing of the danger, she had assumed the risk of injury.

Either conclusion was possible; either would suffice to deny recovery.[6]

---

6. As we observed, there is an accumulating body of evidence as to (1) the propensity of stoppers to eject spontaneously from sparkling wine bottles, (2) the high degree of force with which stoppers eject, whether spontaneously or upon manipulation, and (3) the general risk of harm to persons in proximity to those bottles. It seems clear from the literature, none of which was presented to the jury in this case, that the wine-making industry is well aware of the problem. According to the Eolkin Report (see n. 2, *ante* ), "[w]ork on the stopper premature ejection problem commenced at Asti in September, 1970." See Transcript of Record, Vol. V, p. 937, filed in *Gasque v. Heublein, Inc., supra,* 315 S.E.2d 556. It is also apparent from reported decisions in other cases that at least one major winemaker—Almaden—has, for some time, been putting warning labels on its sparkling wine bottles. See *Murray v. Almaden Vineyards, Inc., supra,* 429 So.2d 24; *Burke v. Almaden Vineyards, Inc., supra,* 86 Cal.App.3d 768, 150 Cal.Rptr. 419.

In this regard, we note the comment made in *Moran v. Faberge, supra,* 273 Md. 538 at 543–44, 332 A.2d 11:

"To begin with we note that a manufacturer's duty to produce a safe product, with appropriate warnings and instructions when necessary, is no different from the responsibility each of us bears to exercise due care to avoid unreasonable risks of harm to others. . . . Whether any such unreasonable risk exists in a given situation depends on balancing the probability and seriousness of harm, if

## (2) Jury Instructions

Appellant makes five specific complaints about the jury's instructions. She alleges error in (1) the giving of a "misuse" instruction,[7] (2) the refusal to instruct the jury that her carelessness or inadvertence, if any, would not bar recovery, (3) the giving of an instruction on assumption of risk, (4) the refusal to articulate for the jury the three different kinds of actionable defects—design, manufacturing, and failure to warn, and (5) a gloss, from instructions given and instructions denied, that drew attention to appellant's conduct.

In large measure, these complaints, particularly (2), (3), and (5), proceed from the notion undergirding appellant's first issue—that the evidence conclusively established that the bottle was unreasonably dangerous and that she was free of fault in the matter. For the reasons discussed in Part (1) of this Opinion, we reject that as a basis for reversal.

The errors alleged in (1) and (4) are part of a much more fundamental problem; the court's instructions, as a whole, so mixed and misstated the theories of recovery pled by

---

care is not exercised, against the cost of taking appropriate precautions.... However, we observe that in cases such as this the cost of giving an adequate warning is usually so minimal, amounting only to the expense of adding some more printing to a label, that this balancing process will almost always weigh in favor of an obligation to warn of latent dangers, if the manufacturer is otherwise required to do so."
(Citations omitted.)

The time may come when, *on a proper evidentiary record,* a court may conclude as a matter of law that these bottles are unreasonably dangerous and that there *is* a duty to warn of the danger. The record in this case, however, is not sufficient in our view to permit us to draw that conclusion here.

7. Appellee Pecora contends that no instruction on misuse was given. He is wrong. The court told the jury that "[a] person cannot recover damages for any kind of breach of warranty if the injury or the damage that they sustained resulted solely from any improper use that they may have made of the goods."

appellant as to create a real probability of confusion in the minds of the jury.

■ We harken back again to the fact that appellant made no claim in her amended complaint of any defect in the design or manufacture of the bottle. Her cause of action in strict liability clearly rested exclusively on a failure to warn. Similarly, as we observed, her action for breach of implied warranty also rested apparently on a failure to warn, there being no other articulated basis for the assertion that the bottle was not merchantable.

Despite the limited nature of her pleading, the court, over defendants' objections, allowed Mr. Green to expound upon and render opinions as to both design and manufacturing defects. The evidence, in that regard, went well beyond the pleading and apparently formed the basis for what followed.

The court commenced its instructions on liability by noting that appellant had alleged two theories, the first being breach of implied warranty of merchantability. It then said that the second theory "advanced by the plaintiff in this case for recovery is that she said that there was a *manufacturing defect* in the bottle ... and *because of this manufacturing defect*, she says that the plastic stopper ejected prematurely and struck her in the eye." (Emphasis added.) Having so characterized the strict liability theory, the court immediately went on to tell the jury that a seller who markets a product with knowledge that the product "would be used without inspection *for design defects* in the part which is claimed to have been defective" is liable "for any kind of injury *resulting from the design defect* which caused the product to be unreasonably dangerous." (Emphasis added.)

The court continued for a while with instructions on design defects, telling the jury,

"In order for you to determine whether this bottle's design was defective, you would have to make a judgment, that is, you have to be convinced by a preponder-

ance of the evidence that *the design* of this bottle was so dangerous to use that it shouldn't have been sold by Mr. Johnson, neither should it have been imported by Mr. Pecora."

(Emphasis added.)

This instruction was followed by a discussion of the "risk/utility" doctrine, the court explaining that the jury must consider the purpose, usefulness, and desirability of the product, the likelihood of injury, the obviousness of the danger, "what manufacturing practicalities may arise in redesigning this bottle," the price of the product, and "the availability of a feasibility for an alternative design." On the heels of that, the court informed the jury that

"you don't have to worry about the actions of the plaintiff in her handling of the bottle of wine if you don't find, number one, that there was an implied breach of warranty or, number two, that there was a *manufacturing defect* ... you only have to worry about whether or not she mishandled this bottle of wine if you find that the defendants are liable to her for *a manufacturing defect.*"

(Emphasis added.)

■ Lost entirely in this flitting back and forth between design and manufacturing defects was any mention of the one theory pled by appellant. Nothing at all was said to the jury about the duty to warn, either for purposes of strict liability or breach of implied warranty. In part at appellant's urging, the whole case was misdirected. To some extent, appellant got caught in her own web of error. With proper instructions, however, the jury could well have found for her. We do not know, and could only speculate, why it returned a defendants' verdict—whether, as noted in part (1), it simply did not accept appellant's version of the event or whether it was so confused by the instructions as to be misled into thinking that appellant was obliged to prove a design or manufacturing defect. Because the latter possibility is a real one, we shall vacate the judgment and remand for a new trial. As much of the confusion was

engendered by appellant over appellees' objections, however, we shall exercise our discretion under Md. Rule 1082 a and charge her with the costs of this appeal. To do otherwise would be unfair.

JUDGMENT VACATED; CASE REMANDED TO CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR RETRIAL; APPELLANT TO PAY THE COSTS.