54 F.3d 773
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 BARBARA A. KOCH, Individually; JAMES P. KOCH, as Husband
and Wife, Plaintiffs-Appellants,
v.
SPORTS HEALTH HOME CARE CORPORATION, d/b/a Medi, Defendant-Appellee.
 No. 94-1346.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 2, 1994.
Decided May 15, 1995.
 
 ARGUED: Thomas Campbell Morrow, MORROW & HASSANI, P.A., Towson, MD, for Appellants. Angus Robert Everton, MASON, KETTERMAN & MORGAN, Baltimore, MD, for Appellee. ON BRIEF: Diane S. Deros, Natasha S. Wesker, MASON, KETTERMAN & MORGAN, Baltimore, MD, for Appellee.
 Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Barbara A. Koch, a nurse at the Johns Hopkins Hospital, was injured while attempting to activate a heat pack manufactured by the Sports Health Home Care Corporation d/b/a Medi ("Medi"). Koch was seen by several doctors and eventually underwent an operation for an ulceration that developed in the area of her injury. While the surgery relieved her pain, she was left without feeling in part of her hand.
 
 
 2
 Koch brought an action against Medi. The case went to the jury on Koch's claims of negligence, and a verdict was returned for the defendant. Koch has appealed, challenging the district court's dismissal of her claims based on strict liability and res ipsa loquitur, the court's admission of testimony concerning her psychiatric condition, and the court's refusal to give several of her requested jury instructions. For the reasons stated below, we affirm.
 
 I. Factual Background
 
 3
 Koch was a registered nurse employed by the Johns Hopkins Hospital. On October 14, 1991, while working in the recovery room at the hospital, she encountered a patient who needed to be warmed. She went to a utility room and took three or four Quick Heat Packs, manufactured by Medi, out of a sealed carton.[1] She proceeded to activate each heat pack by shaking it to distribute the contents evenly, setting it on a flat surface, and striking it firmly.[2] Koch admitted that she probably did not read the instructions on the bag on the day in question because she had read the instructions and used the packs in the past.
 
 
 4
 As soon as Koch hit the allegedly defective pack, she felt a pain akin to an electrical shock that went through her hand and arm and up through her head. Her hand instantly began to swell, and she noticed a tiny pin prick in her hand but no blood. Renay Tyler, a senior clinical nurse in the recovery room at the Johns Hopkins Hospital, saw Koch's hand immediately after the injury, but did not notice a puncture wound or any blood. Tyler testified that after the incident, the bag was leaking and was wet on the outside, and that there were hard substances inside of it that "felt like hard crystal-like rocks." Kimberly Merrill, also a senior clinical nurse at the hospital, was present at the time that Koch attempted to activate the heat pack, and stated that she noticed some redness and swelling of Koch's hand, but saw no breakage of the skin or bleeding. Another witness to the incident, Doris Schmidt, a registrar in the recovery room but not a nurse, testified that she did not see any perforation or tear in the bag and did not notice any liquid leaking from it. She also did not notice any break in Koch's skin or any blood. She did state, however, that she picked up the pack directly after the accident and that it felt like there was a rock in it. When she picked it up a short while later, whatever had been inside had dissolved. Schmidt did not know what happened to the heat pack after she looked at it, and the pack itself was not produced at trial.
 
 
 5
 Koch went to the employee health clinic after the accident, where her hand was x-rayed and no fracture was found. The nurse at the health clinic wrote on a form: "States that she was smashing a bag of Quick-Ice [sic] and bruised right hand." There was no reference in her report to any bleeding or puncture wound, although Koch testified that the nurse examined her hand. Koch returned to the clinic on October 16 and her hand was again examined.
 
 
 6
 On October 22, 1991, eight days after her initial injury occurred, Koch was seen by Dr. Bruce Wolock, an orthopedic surgeon with a specialty in upper extremity surgery. She continued to see Wolock one to two times a week. During the first visit, Wolock observed that Koch's hand was mildly swollen and that she had a puncture wound, which appeared to be healing, on her hand. The wound was approximately one to two millimeters in size. Koch also had tenderness and a Tinel's sign, an indication of nerve irritation. Wolock saw Koch again on November 4, at which point he observed that her pain had gotten worse but that the puncture wound seemed to have healed. He felt that she might be suffering from reflex sympathetic dystrophy and referred her for a bone scan, which showed increased blood flow to the area of her injury. Wolock prescribed a stress loading program and nerve blocks.[3] He also suggested that Koch see Dr. Thomas Brushart, a specialist in nerve injuries. Dr. Brushart recommended that Koch be treated with antidepressant medication and a splint, as well as physical therapy.
 
 
 7
 In January 1992, Koch noticed a change in the condition of her injury. There was a round, red circle on her hand, and she began to experience chills. An associate of Wolock's gave her antibiotics. The circle began to turn black, and Koch went to Union Memorial Hospital. She was admitted and was later seen by Wolock, who noted that she had developed an ulcer over her hand, measuring one-quarter of an inch by one-quarter of an inch. She was then transferred to Children's Hospital to see Dr. Arnold Lee Dellon, a plastic surgeon who specialized in hands. On January 22, 1992, surgery was performed on the hand, during which a portion of a damaged nerve was removed. That operation relieved Koch's pain. Thereafter, she could move her fingers well, but she could not feel the top of her hand.
 
 
 8
 Koch, individually and with her husband, James P. Koch, filed a complaint against Medi in the Circuit Court for Baltimore City. Medi removed the action to the United States District Court for the District of Maryland on September 30, 1992. Koch's amended complaint, filed on November 13, 1992, contained five counts, including negligence, negligent failure to warn, strict liability for manufacturing and design defects and failure to warn, and loss of consortium. A jury trial began on January 31, 1994. At the close of Koch's case in chief, Medi filed a motion for judgment under Federal Rule of Civil Procedure (FRCP) 50(a). The district court granted the motion as to all of the strict liability claims, including defective manufacturing, defective design, and failure to warn. The court concluded that Koch had not produced sufficient evidence to show that the product was in a defective condition at the time it left the control of the seller, and that she had not shown that the product was unreasonably dangerous. The district court also ruled that Koch could not rely on the theory of res ipsa loquitur. The defendant's motion for judgment was denied as to the negligence claim, and the negligence claim was tried to the jury.
 
 
 9
 One issue that was hotly debated during the course of the trial was the extent to which testimony and other evidence regarding Koch's psychological condition should be admitted. Koch had filed a motion in limine before trial, requesting that the district court exclude evidence of her psychiatric treatment prior to October 14, 1991. The motion was denied without prejudice to Koch's right to object later to improper use of the evidence, and during trial, Koch was examined regarding records of psychiatric hospitalizations in 1987 and 1988 for major depression. She was also asked by defense counsel whether she had "hoarded" drugs in 1988. The district judge allowed that evidence to be admitted under FRCP 403, on the grounds that it went to the issue of whether Koch's pain was physical or emotional.
 
 
 10
 Koch called as a witness Dr. Wayne Hunt, a psychologist who had treated her starting in 1987 and had discharged her in 1991 after concluding that she was doing well. Medi called Dr. Jonas Rappeport, a psychiatrist with a subspecialty in forensic psychiatry. Rappeport had reviewed the medical records and depositions concerning Koch and had examined her for three hours on December 20, 1993. He was asked to give an opinion on Koch's psychiatric condition in October 1991. He stated that Koch's basic diagnosis was major depression, and that she had been diagnosed with borderline personality disorder and perhaps with bipolar disorder. Rappeport also stated that Koch's medical records indicated some suicide attempts, that she had taken prescription drugs in quantities larger than those prescribed, and that she had abused alcohol along with the drugs. There was also evidence that she had scratched her wrists, given herself insulin, and inserted a needle into her radial artery. Rappeport was shown the Johns Hopkins Worker's Compensation Clinic records regarding Koch's heat pack injury. He said that there was no mention of a puncture wound or bleeding in the report. He then testified that he could not imagine that the medical personnel that examined Koch after the accident would have missed seeing the wound in Koch's hand, if it existed, and that he believed Koch had made the puncture wound herself after the initial accident "in order to gain some attention to herself, to her hand, to her injury, and, as in past descriptions, to let out the pain."
 
 
 11
 The jury returned a verdict for the defendant, Medi, on the negligence claim. Koch has appealed, challenging the district court's grant of judgment as a matter of law against her on her strict liability and res ipsa loquitur claims, its refusal to give certain of her requested jury instructions, and its decision to admit evidence and testimony concerning her psychological condition.[4]
 
 II. Strict Liability
 
 12
 Medi moved for and was granted judgment as a matter of law under FRCP 50(a) as to Koch's strict liability claims. The district judge ruled: "Whether the strict liability claim is viewed as one relying on the product's design, the product's manufacture or a failure to warn, I am satisfied as a matter of law that the plaintiff has not met the considerable requirements of Rule 402A of Restatement (Second)."[5] We review the district court's grant of judgment as a matter of law de novo. See Gairola v. Commonwealth of Va. Dep't of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir.1985). We must decide whether, looking at the evidence in the light most favorable to Koch, the evidence warranted allowing the claim to go to the jury. See Smith v. Barry, 985 F.2d 180, 184 (4th Cir.), cert. denied, 114 S.Ct. 207 (1993). If reasonable jurors could only reach one conclusion as to the verdict, and it is favorable to Medi, judgment as a matter of law should be granted. See Gairola, 753 F.2d at 1285.
 
 
 13
 This is a diversity case in which Maryland law applies. The Court of Appeals of Maryland adopted the Restatement (Second) of Torts Sec. 402A theory of strict liability in Phipps v. Gen. Motors Corp., 278 Md. 337, 353, 363 A.2d 955, 963 (1976). In that case, the court set forth the elements of a strict liability claim:
 
 
 14
 (1) the product was in a defective condition at the time that it left the possession or control of the seller, (2)[ ] it was unreasonably dangerous to the user or consumer, (3)[ ] the defect was a cause of the injuries, and (4)[ ] the product was expected to and did reach the consumer without substantial change in its condition.
 
 
 15
 Id. at 344, 363 A.2d at 958. In a strict liability case, the court focuses on the product rather than on the manufacturer. Id.; Simpson v. Standard Container Co., 72 Md.App. 199, 203, 527 A.2d 1337, 1339, cert. denied, 311 Md. 286, 533 A.2d 1308 (1987). Recovery in a products liability action may not be based on a presumption from the mere occurrence of an accident. Jensen v. American Motors Corp., Inc., 50 Md.App. 226, 232, 437 A.2d 242, 245 (1981). However, one may draw the inference that a product is defective from the occurrence of an accident "where circumstantial evidence tends to eliminate other causes...." Harrison v. Bill Cairns Pontiac of Marlow Heights, Inc., 77 Md.App. 41, 50, 549 A.2d 385, 390 (1988).
 
 A. Design Defect
 
 16
 Maryland courts typically apply the "consumer expectation" test to determine whether a product has a design defect. Simpson, 72 Md.App. at 203-04, 527 A.2d at 1340. The product must be unreasonably dangerous at the time it was sold and in a defective condition for a design defect to exist, Phipps, 278 Md. at 344, 363 A.2d at 959; these two factors are measured against the expectations and knowledge of the ultimate consumer, see id. "Proof of one factor but not the other will defeat the plaintiff's claim." Ziegler v. Kawasaki Heavy Indus., Ltd., 74 Md.App. 613, 619-20, 539 A.2d 701, 704 (quoting Gilbert, Maryland Tort Law Handbook Sec. 12.2 (1986)), cert. denied, 313 Md. 32, 542 A.2d 858 (1988).[6] Thus to prevail on her claim, Koch had to show both that the heat pack was in a defective condition at the time it left the manufacturer, Medi, and that the defect rendered it unreasonably dangerous.
 
 
 17
 The district judge found that Koch's attempt to prove that the product was defective at the time it left the seller's possession or control was insufficient. Comment g to Sec. 402A of the Restatement (Second) of Torts (1965) states:
 
 
 18
 The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.... The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained.
 
 
 19
 Koch presented no evidence tending to show that a design defect existed in the heat pack when it left the manufacturer. Koch's only evidence concerning the actual condition of the product when it left the manufacturer was that she subsequently took the heat pack out of a new, sealed box. She produced no testimony concerning how the product was designed or tending to show that the product should have been designed differently, and thus did not sustain her burden of producing evidence on the existence of a design defect at the time the heat pack left the manufacturer.
 
 
 20
 Because Koch's evidence concerning the design of Medi's heat pack was insufficient, we do not need to address whether the design was unreasonably dangerous. See Ziegler, 74 Md.App. at 619-20, 539 A.2d at 704 (proof of a design defect requires a showing both of the defective state of the product and of an unreasonably dangerous condition). The district judge was therefore correct in granting judgment as a matter of law to Medi on Koch's design defect strict liability claim.
 
 B. Manufacturing Defect
 
 21
 The defectiveness test of Sec. 402A of the Restatement is less difficult to apply in the manufacturing defect context than in the design defect context. Phipps, 278 Md. at 344-45, 363 A.2d at 959. Discussing the law in Maryland on strict liability, we have stated that the issue in a design defect case is whether the manufacturer was reasonable in marketing its product, knowing of its dangers. Singleton v. Int'l Harvester Co., 685 F.2d 112, 115 (4th Cir.1981). In contrast, "[i]n manufacturing defect cases, the plaintiff proves that the product is defective by simply showing that it does not conform to the manufacturer's specifications." Id.
 
 
 22
 To recover under a strict liability theory for a manufacturing defect, a plaintiff must show that the defect in the product existed at the time it left the seller's control, that the product remained in substantially the same condition when it reached the plaintiff, and that it was unreasonably dangerous. See Phipps, 278 Md. at 344, 363 A.2d at 958. One may draw the inference that a product is defective from the occurrence of an accident
 
 
 23
 where circumstantial evidence tends to eliminate other causes, such as product misuse or alteration.... Factors to be considered in determining whether a product defect may be inferred from circumstantial evidence include:
 
 
 24
 (1) expert testimony as to possible causes; (2) the occurrence of the accident a short time after the sale; (3) same accidents in similar products; (4) the elimination of other causes of the accident; (5) the type of accident that does not happen without a defect.
 
 
 25
 Harrison, 77 Md.App. at 51, 549 A.2d at 390; see also Virgil v. "Kash n' Karry" Serv. Corp., 61 Md.App. 23, 32, 484 A.2d 652, 657 (1984) ("An inference of a defect may be drawn from the happening of an accident, where circumstantial evidence tends to eliminate other causes, such as product misuse or alteration."), cert. denied, 302 Md. 681, 490 A.2d 719 (1985). In addition, a plaintiff may prove that a product was defective by showing that it did not conform to the manufacturer's own specifications. See Singleton, 685 F.2d at 115.
 
 
 26
 Koch did not provide evidence concerning Medi's methods of manufacturing or its product specifications in order to show that the heat pack in question was defective due to nonconformity with the manufacturer's standards. However, she produced some circumstantial evidence directed at creating an inference that the accident occurred due to a defect in the heat pack. Koch testified that she took the heat pack out of a sealed, new box. In addition, her expert, Dr. Theodore Smith, a professor of chemical engineering at the University of Maryland, testified as to what theoretically could happen to a heat pack to render it defective. He stated that, when a heat pack works properly, the water in the pack mixes with the calcium chloride when the pack is activated and forms a liquid which releases heat. However, if only a small amount of the water were released into the calcium chloride (due to a leak in the inner water bag, for example), the calcium chloride would absorb the water and form a solid mass, such as the one which Koch testified was in the heat pack when she struck it. Smith, while acknowledging that he was not an expert in the manufacture of such bags, testified that a leak could be caused in the process of heat-sealing the inner water bag by contamination from a particle of dust or from grease or oil from a person's hand. A leak could also occur if the surfaces of the bag were not completely flat when they were sealed.
 
 
 27
 However, Smith did not examine the particular pack which injured Koch, since that bag was not located after the incident. And although Koch produced testimony that the accident occurred shortly after she opened the sealed box of heat packs, there was no evidence presented concerning the date of manufacture of the heat pack or the date of sale by Medi of the pack. Koch also failed to produce any evidence of similar accidents involving heat packs. Most importantly, there was no evidence presented as to the way in which the box of heat packs was handled between the time that it left the manufacturer and the time that Koch took a heat pack from the box. Although the fact that the box of heat packs was sealed provides support for the contention that the heat pack itself was not opened between the time it was put in the box and the time that Koch attempted to activate it, Koch produced no evidence addressing how much time elapsed between the manufacture and her use of the heat pack, and she did not address the events that transpired between Medi's plant and her removal of the heat pack from the sealed carton. In other words, Koch did not produce any evidence tending to eliminate other causes for the defect that could have occurred between Medi's plant and the hospital at which Koch worked. Koch thus did not satisfy her burden of showing that a defect existed in the heat pack at the time of sale, and did not show that the pack was in substantially the same condition when she attempted to activate it and when it left Medi's plant.
 
 
 28
 In light of the fact that Koch did not satisfy her burden of showing the creation of a manufacturing defect at Medi's plant and the arrival of the heat pack at Koch's hospital in a substantially unaltered state, we affirm the district court's grant of judgment as a matter of law to Medi on the strict liability claim of manufacturing defect.[7]
 
 
 29
 In addition, since we find that the district judge was correct in granting judgment as a matter of law on Koch's strict liability claims, the judge was clearly correct in refusing Koch's jury instructions regarding strict liability.
 
 III. Res Ipsa Loquitur
 
 30
 In Chesapeake & Potomac Telephone Co. of Maryland v. Hicks, 25 Md.App. 503, 337 A.2d 744 (1975), the Maryland Court of Special Appeals listed the three elements on which a plaintiff must provide evidence in order to be able to invoke the res ipsa loquitur doctrine: (1) An injury of the type which usually does not occur in the absence of negligence; (2) caused by an instrumentality within the exclusive control of the defendant; and (3) which was not a result of an act or omission by the plaintiff. Id. at 516, 337 A.2d at 752. Finding that Koch's proof failed as to the second element of a res ipsa loquitur claim under Chesapeake & Potomac, the district judge ruled at the close of Koch's case that she had not produced sufficient evidence to show that a theory of res ipsa loquitur would apply to her case.
 
 
 31
 Koch has asserted that exclusive control of an instrumentality by the defendant may be established by evidence that would warrant inferring that there was control; she has attempted to find support for this proposition in the case of Leidenfrost v. Atlantic Masonry, Inc., 235 Md. 244, 201 A.2d 336 (1964), in which the Maryland Court of Appeals stated that "[t]he plaintiff is not required in his proof to exclude remotely possible causes and reduce the question of control to a scientific certainty." Id. at 250, 201 A.2d at 339. In the case at hand, however, Koch has not only failed to show control to a "scientific certainty," but has produced essentially no evidence addressing the handling and condition of the box of heat packs between the time it left the manufacturer and the point at which it arrived at the hospital. Although Koch testified that the product came in a sealed plastic bag and that she took it from a newly opened carton, Koch did not address the shipping of the box or the condition or handling of the box while it was in transit, nor did she show who was responsible for transporting the box. Koch did not address how long the product was stored and did not produce any evidence concerning the condition of the room in which the packs were stored in the hospital or elsewhere.
 
 
 32
 Since Koch did not show that the heat pack was in the exclusive control of Medi, the district court's conclusion that she could not rely on a theory of res ipsa loquitur was proper. Having justifiably found that Koch could not invoke the doctrine of res ipsa loquitur, the district judge was also correct in refusing to instruct the jury on that theory.
 
 
 33
 IV. Jury Instructions on Negligent Failure to Warn
 
 
 34
 At trial, the district judge gave to the jury the following instruction concerning the theory of a manufacturer's duty to warn in negligence: If despite exercising reasonable care in the design, manufacturing, testing and inspection of the product, the product still cannot be made safe for its reasonably foreseeable use, and the manufacturer knows or through the use of reasonable care should know that the dangerous condition is not obvious to the user of the product, the manufacturer has a duty to give an adequate warning of the danger. A failure to fulfill that duty is negligence. The instruction which Koch proffered to the district court was similar to that given by the judge, but counsel for Koch requested the addition of a statement that
 
 
 35
 [i]n determining whether a manufacturer should know that a the [sic] product possesses a danger that is not obvious to users, a manufacturer is charged with the knowledge of an expert in the applicable field. Thus, in the case at hand, Defendant Medi, Inc. is presumed to have the knowledge of an expert in the field of chemical engineering.
 
 
 36
 Koch has appealed the court's denial of her jury instruction. The decision of a district court to give (or not to give) a jury instruction is reviewed under an abuse of discretion standard. United States v. Russell, 971 F.2d 1098, 1107 (4th Cir.1992), cert. denied, 113 S.Ct. 1013 (1993). A judgment will be reversed for error in jury instructions "only if the error is determined to have been prejudicial, based on a review of the record as a whole." Wellington v. Daniels, 717 F.2d 932, 938 (4th Cir.1983); see also Spell v. McDaniel, 824 F.2d 1380, 1395 (4th Cir.1987) ("The test of adequacy of instructions .... is simply the practical one of whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party."), cert. denied, 484 U.S. 1027 (1988).
 
 
 37
 As support for her contention that the district court failed to give the jury a necessary instruction on a controlling legal principle, Koch has pointed us to the case of Owens-Illinois, Inc. v. Zenobia, 325 Md. 420, 601 A.2d 633 (1992), in which the Maryland Court of Appeals held, in the strict liability failure to warn context, that the manufac turer of a product is held to possess the knowledge of an expert in the field. Id. at 437, 601 A.2d at 641. Further, Koch argues that the district court's refusal to give her requested instruction was prejudicial. Dr. Smith, a chemical engineer who testified for Koch, explained how a rock-like substance might form inside of a heat pack. Koch claims that if the jury had been instructed to hold Medi to the standard of knowledge of a chemical engineer, Medi would have been charged with knowledge of the same information to which Smith testified. However, she argues, because her instruction was not given and testimony was introduced at trial establishing that the type of accident that occurred in this case had never occurred before, the jury was left with the impression that Medi had no reason to know of the danger of its product and therefore had no duty to warn. The district judge, in denying Koch's suggested instruction, first questioned the relevance of the Zenobia case in the context of a negligent failure to warn claim, and then stated that the portions of the instruction addressing knowledge of an expert in the field were essentially argument which could be made by counsel directly to the jury.
 
 
 38
 The district judge found that Koch had not produced an expert in Medi's field of business to testify regarding the standard of knowledge to which Medi should be held. Medi was in the business of making ice and heat packs. Koch produced a professor of chemical engineering as an expert in the field, who testified to the chemical properties of calcium chloride and water, and the reaction that results when they are mixed. Because Medi's heat packs contain calcium chloride and water, Koch reasoned that Medi should be held to the chemical engineer's standard of knowledge and expertise. Yet, at a minimum, she should have produced some evidence showing that Smith could be considered an expert in the field of the manufacture of a product such as Medi's, or that he had expert information concerning the process by which Medi heat packs were sealed. Koch did not, however, produce any such evidence. It was within the district judge's discretion to decide that Koch had failed to show that Smith should be presented to the jury as an expert in the relevant field of business for purposes of a jury instruction on the manufacturer's duty to warn. The judge did not abuse his discretion in denying Koch's requested jury instruction on the duty to warn, and in leaving the point to be made by Koch's counsel in argument.
 
 V. Psychological Evidence
 
 39
 Finally, Koch has challenged the district court's admission of evidence concerning her previous psychiatric condition and treatment, as well as its admission of the testimony of Dr. Jonas Rappeport, a forensic psychiatrist. District court determinations on the admissibility of evidence are reviewed for abuse of discretion. Distaff, Inc. v. Springfield Contracting Corp., 984 F.2d 108, 111 (4th Cir.1993). We will defer to the decision of the trial court under Federal Rules of Evidence (FRE) 403 and 404(b) unless it constitutes "an arbitrary or irrational exercise of discretion." Garraghty v. Jordan, 830 F.2d 1295, 1298 (4th Cir.1987); see also Estate of Larkins v. Farrell Lines, Inc., 806 F.2d 510, 515 (4th Cir.1986), cert. denied, 481 U.S. 1037 (1987).
 
 
 40
 Koch's first objection to the testimony of Rappeport, the defendant's expert in forensic psychiatry, is that Rappeport was permitted to testify concerning the credibility of certain witnesses. She points out that a psychiatrist is not allowed to render an opinion on the credibility of a witness, an issue reserved solely for the jury. See United States v. Cecil, 836 F.2d 1431, 1441 (4th Cir.), cert. denied, 487 U.S. 1205 (1988). Koch had testified at trial that she suffered a puncture wound as a result of hitting the Medi heat pack. Rappeport, however, vouched for the records of the worker's compensation clinic, which did not contain any indication that Koch had received such a wound. He also testified that nursing personnel would not have missed seeing a puncture wound when they examined Koch after the accident. Koch contends that by supporting medical records that contradicted her testimony, Rappeport attacked Koch's truthfulness.
 
 
 41
 However, Medi, after examination and cross-examination on Rappeport's qualifications, presented Rappeport to the court as an expert. He was a doctor licensed to practice medicine in Maryland. Rappeport was certainly qualified to testify regarding nursing procedure and to say whether, in his opinion, nurses would notice a certain type of wound when examining a patient. Although Rappeport's testimony on nursing procedure may have served to discredit Koch, it was by no means improper testimony for a medical expert. Koch's objection to Rappeport's testimony on the theory that it was a "thinly disguised" comment on her own credibility, therefore, is unfounded.
 
 
 42
 Rappeport also testified, over objection, that the ulceration experienced by Koch in January 1991 probably did not result from her original accident in October of the previous year. She contends that through his testimony, Rappeport attempted to resolve a credibility dispute between two experts who had expressed conflicting viewpoints on the origin of Koch's ulceration, thereby resolving disputed factual issues for the jury.
 
 
 43
 The jury must be aware of the facts on which an expert opinion is based, United States v. Varoz, 740 F.2d 772, 775 (10th Cir.1984), because it is within the province of the jury to determine whether the facts relied upon by the expert are true or not, see Fowler v. Land Management Groupe, Inc., 978 F.2d 158, 162 (4th Cir.1992). Rappeport's opinion concerning the ulceration followed a detailed review of the evidence in front of the jury by Rappeport and defense counsel. Rappeport described to the jury, through extensive questioning, the way in which he came to his conclusion and the evidence upon which his conclusion was based. Contrary to Koch's assertions, the underlying facts (the existence of an ulceration and the time at which it manifested itself) were not in dispute; rather, the conflict in the testimony centered around the conclusion to be drawn from those facts (the cause of the ulceration). Rappeport's testimony regarding the cause of the ulceration, which was based on medical evidence in the record, was entirely proper. The district judge did not abuse his discretion in allowing Rappeport to testify concerning the ulceration.
 
 
 44
 Next, Koch challenges the district court's admission of testimony by Rappeport, as well as other documentary and testimonial evidence, concerning her psychiatric history. Rappeport testified for the defense concerning Koch's psychiatric condition after reviewing her medical records, reading the deposition testimony of Doctors Wolock, Dellon, and McClinton, and examining Koch for three hours. In addition, Medi produced other documentary evidence regarding Koch's alleged prior history of "hoarding" drugs and her previous admissions for psychiatric treatment for major depression, and cross-examined her regarding her psychiatric background.[8] The district court felt that tes timony addressing Koch's psychiatric history was relevant to the issues of (1) whether she, herself, might have inflicted the puncture wound that she alleged came about at the time of the accident, but which was not documented by any medical professional until eight days after the accident, and (2) whether she might have been exaggerating the degree of pain that she was experiencing from her injury, i.e. that her pain might have been "emotional" as opposed to "real."
 
 
 45
 Under FRE 404, character evidence is generally inadmissible to show that a person acted in conformity with that character at a particular time. See FRE 404(a). "Evidence of other crimes, wrongs, or acts ... may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." Id. at (b). The rule applies in both civil and criminal actions. Huddleston v. United States, 485 U.S. 681, 685 (1988). Even though certain character evidence may be admissible under Rule 404, a judge must also determine whether the probative value of the evidence is "substantially outweighed" by the possible prejudicial effect of admitting it and if so, the evidence should be excluded. See FRE 403. In general, Rule 403 favors the admissibility of evidence in close cases. United States v. Moore, 732 F.2d 983, 989 (D.C.Cir.1984).
 
 
 46
 Conflicting testimony was presented during the trial concerning the puncture wound sustained by Koch. While Koch testified that she received the injury when she first struck the heat pack, other witnesses to the incident who examined her hand found no such wound, and the first documentation of the wound occurred eight days after the initial accident. The district judge allowed in deposition testimony of Koch's own witness, Dellon, saying that he found no evidence of a self-inflicted wound, and the similar deposition testimony of Wolock. Rappeport, the defendant's expert, opined that Koch had herself inflicted the puncture wound. The district court found that Koch had opened the door to evidence concerning the origin of the puncture wound because her own witness, Dellon, had mentioned the issue of self-infliction in his treatment report.
 
 
 47
 Koch urges this court to exclude evidence of her psychological background because it signifies an attempt on Medi's part to introduce impermissible propensity evidence. However, we have found no abuse of discretion where district courts have admitted testimony concerning the background of an individual for purposes other than proving propensity to act in accordance with that background. See, e.g., Estate of Larkins, 806 F.2d 510. In Estate of Larkins, the captain of a ship ordered the crew to clear the deck during a rough night at sea. Larkins was last seen in his room at 8 p.m. that night and was reported missing the next morning. Larkins' estate sued Farrell Lines, claiming that the vessel on which he traveled was not seaworthy. His widow alleged that the ship's officers knew that Larkins suffered from epilepsy but had failed to take precautions to protect him. At trial, the judge allowed evidence of Larkins' alcoholism to be admitted, and the plaintiff contested that ruling. We held on appeal that allowing such evidence was not an abuse of discretion: "[T]he evidence was relevant to the cause, severity, and treatment of Larkins' seizures, to plaintiff's complaints of medical malpractice, and to defendant's failure to take special precautions in his behalf." Id. at 515; see also Glover v. BIC Corp., 6 F.3d 1318, 1328-29 (9th Cir.1993) (finding more probative than prejudicial the evidence of previous instances in which the decedent had been intoxicated and fires had occurred in his home, introduced to show that the decedent had died from a cooking fire which he was unable to extinguish because he was intoxicated, rather than from a lighter manufactured by the defendant which ignited in his pocket); Young v. Rabideau, 821 F.2d 373, 380-82 (7th Cir.1987) (stating that a plaintiff had opened the door for the admission of testimony concerning his prior prison discipline record under FRE 404(b) when he claimed that his actions in putting his finger in an officer's face and swinging a chain in his direction were not intentional), cert. denied, 484 U.S. 915 (1987).
 
 
 48
 Similarly, in the instant case, a great deal of the evidence concerning Koch's psychological background was properly admissible under FRE 404(b) as evidence of the absence of an accident which could be used to explain the puncture wound. Koch contended at trial that the puncture wound on her hand occurred as a result of her striking the heat pack. However, the time at which the puncture wound occurred was a material disputed issue in the case due to the conflict between Koch's account of the injury and that of every medical professional who examined her at the time of the accident. In fact, Koch's own witness drew attention to the issue of self-infliction. Medi used certain evidence showing that Koch had, in the past, injured herself to gain attention or to "let her pain out" in order to prove that, rather than occurring as the result of an accident, the injury might have been inflicted, or at least aggravated, by Koch herself. The evidence was introduced for the proper purpose of negating Koch's contention that the puncture wound was the result of an accident.
 
 
 49
 In addition, the district court did not err in finding that the evidence on Koch's background was more probative than prejudicial under FRE 403. A material dispute concerning the time at which Koch sustained her puncture wound existed in this case, and evidence concerning Koch's psychological background was highly probative on this issue. Although there was a danger of prejudice in the admission of such evidence, it was important for the jury to be apprised of all relevant information concerning Koch's background, once they had been presented with the self-infliction theory. Since the plaintiff's own witness had introduced psychological testimony regarding the plaintiff, the defendant was entitled to challenge the plaintiff's contention that the puncture injury had occurred as the result of an accident, and to attempt to explain why Koch claimed the presence of a wound which was not noticed by medical professionals. In essence, there was enough of a conflict in the testimony to posit Koch's psychological history as a valid subject of argument. Although the admission of some of the evidence going to Koch's psychological state standing alone might have been questionable, the district judge did not abuse his discretion in deciding that the importance of admitting the whole story as to Koch's background outweighed the possible prejudice that would result.
 
 
 50
 In sum, we find Koch's claims of error in the district court proceedings to be without merit. Accordingly, the judgment is
 
 
 51
 AFFIRMED.
 
 
 
 [1]
 Koch apparently took some heat packs out of an open box, and then took others out of a sealed carton. The evidence indicates that the heat pack which caused her injury came from the sealed carton
 
 
 [2]
 The heat packs contain calcium chloride and an inner bag filled with water. The inner bag has one edge which is perforated and which should break when pressure is applied to it. If the heat pack functions correctly, the water bag inside bursts when the pack is struck and the water mixes with the calcium chloride, releasing a great deal of heat
 
 
 [3]
 A stress loading program is a type of physical therapy, and nerve blocks are a procedure performed by an anesthesiologist which blocks nerves to the arm to decrease the pain
 
 
 [4]
 Because Koch's other claims failed, the loss of consortium claim was also unsuccessful
 
 
 [5]
 Koch has not challenged on appeal the district court's disposition of the strict liability failure to warn claim, although she has contested the district court's decision to deny her suggested jury instruction on negligent failure to warn
 
 
 [6]
 There is no dispute for purposes of this appeal that Koch has satisfied her burden under Phipps of showing that the heat pack was the cause of the initial bruising and swelling of her hand. See Phipps, 278 Md. at 344, 363 A.2d at 958
 
 
 [7]
 Koch has also asserted that because the trial court failed explicitly to distinguish between the standard of proof in a strict liability manufacturing defect case and that in a design defect case, the judgment should be vacated. In support of such a proposition, she has cited Dechello v. Johnson Enters., 74 Md.App. 228, 536 A.2d 1203, cert. denied, 312 Md. 601, 541 A.2d 964 (1988). In Dechello, the plaintiff was hit in the eye by a plastic stopper which flew off of a bottle of sparkling wine. On appeal, she contended that the trial judge had erred in failing to differentiate between the strict liability theories of design defect, manufacturing defect, and failure to warn in the jury instructions. The reviewing court held that the judge had so mixed up the theories of recovery in the instructions that the jury could easily have been confused, and it therefore vacated the judgment and remanded the case for a retrial. Id. at 240-41, 536 A.2d at 1210-11. Since we find that Koch has not satisfied her burden of producing enough evidence to warrant sending either of her strict liability claims to a jury, the fact that the district judge did not explicitly differentiate between manufacturing and design defects is of no consequence
 
 
 [8]
 Among the evidence introduced by Medi was an Attending Admission Note written by Dr. John Lipsey of the Johns Hopkins Hospital on October 11, 1988, after Koch was admitted to the hospital for depression and drug abuse. Lipsey wrote that Koch had admitted to "hoarding" drugs in the past, and that she had had several past psychiatric admissions. Koch's Final Progress Note from the Johns Hopkins Hospital after she was discharged on October 17, 1988 stated that she suffered from major depression, mixed personality disorder with borderline and histrionic features, and polysubstance abuse
 In addition, Medi introduced information from Dr. Mitchell Cohen, a psychiatrist at the Johns Hopkins Hospital whom Koch had seen on January 7, 1992. Koch's appointment with Cohen was set up by Dr. Linda Cameron, an anesthesiologist with whom Koch had worked and who was concerned about Koch's ability to deal with her injury psychologically. Koch thought that Cohen was a chronic pain doctor, and she claims that as soon as she learned that he was actually a psychiatrist, she left his office. In his evaluation of Koch, Cohen opined, "I think today she presented in [sic] a mixed exacerbation of bipolar disorder, with depressive and hypomanic features." Koch maintained, however, that she was only in Cohen's office for a very short time.
 Koch's medical records also indicated some suicide attempts, in which she took more than the prescribed dosage of her medicine and abused alcohol at the same time. There was other evidence of her scratching her wrists, injecting herself with insulin, and putting a needle in her radial artery "to let the bad feelings out." Rappeport, the defense expert, testified that some patients inflict physical pain on themselves to relieve emotional pain.